1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM & WATKINS LLP
  David J. Schindler (Bar No. 130490)
  *david.schindler@lw.com*
  Manuel A. Abascal (Bar No. 171301)
  *manny.abascal@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763

Attorneys for Defendant Danny Pang

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>          vs.<br><br>PRIVATE EQUITY MANAGEMENT GROUP, LLC; PRIVATE EQUITY MANAGEMENT GROUP, INC.; and DANNY PANG,<br><br>                    Defendants. | CASE NO. CV09-2901 PSG (EX)<br><br>MOTION TO DISSOLVE TEMPORARY RESTRAINING ORDER, OR IN THE ALTERNATIVE TO MODIFY GRANT OF EXPEDITED DISCOVERY AND TO AMEND ORDER FREEZING ASSETS |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................. 1

II.   STATEMENT OF FACTS ................................................................... 5

    A.    PEMG's Business ................................................................ 5

    B.    SEC Failed To Alert The Court Of The Language In The
          Contracts With The Banks .................................................. 8

    C.    The SEC Proceeded Despite The Fact That PEMG Had Agreed
          to Cooperate ........................................................................ 9

    D.    The SEC's Only Witness Is Completely Lacking In Credibility ....... 10

    E.    The SEC Failed to Corroborate Mr. Aboubakare's Claim
          Regarding The Alleged Ponzi Scheme ............................. 12

    F.    The SEC Has Provided Absolutely No Financial Evidence
          Regarding PEMG ............................................................. 13

III.  ARGUMENT .................................................................................... 14

    A.    The SEC Improperly Sought An Ex Parte Temporary
          Restraining Order ............................................................. 14

          1.    The SEC Made No Showing Of Immediate And
                Irreparable Injury .................................................. 14

          2.    The SEC Did Not Establish The Extraordinary
                Circumstances Necessary to Justify An Ex Parte
                Proceeding ............................................................ 16

    B.    This Court Lacks Jurisdiction To Enter and To Enforce The
          Temporary Restraining Order ........................................... 17

    C.    The SEC Failed To Meet The Standard For A Temporary
          Restraining Order ............................................................. 19

          1.    The SEC Has Not Made A Prima Facie Showing Of A
                Violation Of The Securities Laws ......................... 19

          2.    The SEC Did Not Show A Likelihood That Any Alleged
                Fraud Was Ongoing Or Would Be Repeated ........ 20

          3.    The SEC Has Not Shown A Probability of Success On
                The Merits ............................................................. 21

                a.    The SEC Relied on Mr. Aboubakare, and His
                      Testimony Has No Credibility or Evidentiary
                      Value ......................................................... 22

b.    The SEC Failed To Prove Any Misstatement With Regard To The Use Of Funds ........................................ 23

c.    The SEC Failed to Show Misappropriation of Assets ....................................................................... 24

d.    The SEC's Actions Were Not Based On Evidence From Of The Allegedly Victimized Taiwanese Banks ........................................................................ 25

e.    The SEC Failed to Allege or Show That the Alleged Misstatements Regarding Education and Employment Were Material or Made to Investors ........ 26

4.    The SEC Did Not Establish A Possibility of Irreparable Harm ........................................................................ 26

D.    The SEC Failed To Plead Fraud With Particularity ......................... 27

E.    In the Event the Order Is Not Dissolved In Its Entirety, The Court Should Modify the Order To Provide Mr. Pang With A Fair Proceeding ................................................................... 27

1.    Mr. Pang Should Be Allowed To Attend To His Business ..... 28

2.    The Asset Freeze Against Mr. Pang Should Be Modified Substantially .............................................................. 28

3.    The Court Should Schedule A Hearing To Determine If A Receiver And An Asset Freeze of PEMG Is Truly Necessary ................................................................. 31

4.    Paragraphs XIII and XV Allowing the SEC Access to PEMG and Requiring An Accounting Should Be Deleted ..... 33

5.    Paragraph XVI Regarding Expedited Discovery Should Be Eliminated .............................................................. 33

6.    Paragraph XVIII Requiring Repatriation of Assets Should Be Deleted ......................................................... 33

7.    Travel Restriction And Passport ..................................... 34

IV.    CONCLUSION ................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Basic, Inc. v. Levinson,*
 485 U.S. 224 (1988) ................................................................ 26

*Butte Mining PLC v. Smith,*
 76 F.3d 287 (9th Cir. 1996) ..................................................... 17

*CFTC v. Noble Metals Int'l,*
 67 F.3d 766 (9th Cir. 1995) ..................................................... 30

*DeBeers Consol. Mines, Ltd. v. United States,*
 325 U.S. 212 (1945) ................................................................ 29

*Feed Management Systems, Inc. v. Brill,*
 No. 06-4126 2006 WL 3247195 (D. Minn. 2006) ........................... 22

*FSLIC v. Sahni,*
 868 F.2d 1096 (9th Cir. 1989) .................................................. 28

*FTC v. World Wide Factors,*
 882 F.2d 344 (9th Cir. 1989) ................................................... 30

*Greenhouse v. MCG Capital Corp.,*
 392 F.3d 650 (4th Cir. 2004) ................................................... 26

*Grunenthal GmbH v. Hotz,*
 712 F.2d 421 (9th Cir. 1983) ............................................. 17, 19

*Hoxworth v. Blinder, Robinson & Co.,*
 903 F.2d 186 (3rd Cir. 1990) ................................................... 29

*In re Intermagnetics Am.,*
 101 B.R. 191 (C.D. Cal. 1989) ................................................. 16

*Insussary v. Adminstaff Cos.,*
 1999 U.S. Dist LEXIS 7154 (S.D.N.Y. 1999) ............................... 31

*Lindquist v. Vennum P.L.L.P. v. Speciale,*
 2008 U.S. Dist. LEXIS 25128 (D. Minn. 2008) ............................ 22

*Lyda v. United States,*
 321 F.2d 788 (9th Cir. 1963) ................................................... 22

*MRC Golf, Inc., v. Hippo Golf Company, Inc.,*
 No. 09-CV 327-L 2009 U.S. Dist. LEXIS 15625 (S.D. Cal. Feb. 26,
 2009) .................................................................................... 16

*Reno Air Racing Ass'n, Inc. v. McCord,*
 452 F.3d 1126 (9th Cir. 2006) ................................................. 16

*Royal Air Properties, Inc. v. Smith,*
    312 F.2d 210 (9th Cir. 1962) ................................................................. 19

*Santa Fe Indus., Inc. v. Green,*
    430 U.S. 462 (1977) ............................................................................. 24

*SEC v. Belmont Reid & Co., Inc.,*
    794 F.2d 1388 (9th Cir. 1986) .............................................................. 18

*SEC v. Credit First Fund, LP,*
    No. CV-05-8741, 2006 U.S. Dist. LEXIS 96697 (C.D. Cal. Feb. 13,
    2006) .................................................................................................... 26

*SEC v. ETS Payphones, Inc.,*
    408 F.3d 727 (11th Cir. 2005) .............................................................. 29

*SEC v. Gonzalez de Castilla,*
    170 F.Supp.2d 427 (S.D.N.Y. 2001) ............................................... 29, 30

*SEC v. Grossman,*
    2003 U.S. Dist. LEXIS 317 (S.D.N.Y. 2003) ...................................... 30

*SEC v. Int'l Loan Network, Inc.,*
    770 F. Supp. 678 (D.D.C. 1991) .......................................................... 30

*SEC v. Lauer,*
    445 F. Supp. 2d 1362 (S.D. Fla. 2006) ................................................ 29

*SEC v. Manor Nursing Ctrs., Inc.,*
    458 F.2d 1082 (2d Cir. 1972) .............................................................. 32

*SEC v. McMillan,*
    2006 U.S. Dist. LEXIS 89150 (D. Ariz. Dec. 7, 2006) ....................... 28

*SEC v. Phan,*
    500 F.3d 895 (9th Cir. 2007) ............................................................... 19

*SEC v. Spence & Green Chemical Co.,*
    612 F. 2d 896 (5th Cir. 1980) ......................................................... 31, 32

*SEC v. Unique Fin. Concepts, Inc.,*
    196 F.3d 1195 (11th Cir. 1999) ........................................................... 19

*SEC v. United Financial Group, Inc.,*
    474 F.2d 354 (9th Cir. 1973) ............................................................... 19

*United States v. Nutri-Cology, Inc.,*
    982 F.2d 394 (9th Cir. 1992) .......................................................... 19, 26

*Vess v. Ciba-Geigy Corp.,*
    317 F.3d 1097 (9th Cir. 2003) ............................................................. 27

*White v. Abrams,*
    495 F.2d 724 (9th Cir. 1974) .......................................................... 19, 20

1

**STATUTES**

2    15 U.S.C. § 77b(a)(1) ........................................................... 18

3    15 U.S.C. § 77q(a) ............................................................... 19

4    15 U.S.C. § 78c(a)(10) .......................................................... 18

5

**RULES**

6

Fed. R. Civ. P. 41(b) ............................................................ 20

7    Fed. R. Civ. P. 9(b) ............................................................. 27

8

9

**OTHER AUTHORITIES**

10

Judge Stephen S. Trott, *Words of Warning for Prosecutors Using Criminals
    as Witnesses*, 47 Hastings L. J. 1381 (1996) ................................ 22

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.   INTRODUCTION

In its zeal to avoid further criticism arising from its failure to identify the Bernard Madoff ponzi scheme, the SEC has created the illusion of an emergency in order to seize an ongoing business and to vilify defendant Danny Pang as the next Bernard Madoff.  In doing so, the SEC has trampled upon the fundamental principles of due process.  The SEC obtained an order from this court that seized Mr. Pang's business, banned him from working at his business, seized all of Mr. Pang's possessions, and prohibits Mr. Pang from spending any of his money on anything, including hiring a lawyer.  The SEC did so, in secret, without a trial, without a hearing, without even notifying Mr. Pang or his counsel, and based solely on the hearsay declaration of a disgruntled former employee, who was never cross-examined, and who had previously sought to shake down Mr. Pang's company.

Fortunately, Mr. Pang now has an opportunity to respond, and this Motion will illustrate why the principles of notice, an opportunity to be heard, and confrontation are so important to our legal system.  The SEC's precipitous seizure of a business overseeing assets worth hundreds of millions of dollars was based entirely on a hearsay declaration detailing a secret interview of a former Private Equity Management Group, Inc. ("PEMG") employee, who claimed that Mr. Pang allegedly told him in 2006 or 2007 that PEMG was running a $25 million ponzi scheme.  The SEC failed in its Motion to tell the Court the following essential facts:

- The employee had embezzled $3 million from Mr. Pang's business, had engaged in numerous instances of sexual harassment, and was ultimately fired and sued by PEMG;
- The employee now runs a business that competes with PEMG, and the SEC's order has greatly assisted that employee's business by shutting down the very entity that devised the novel

business plan carried out at PEMG;

- That the former employee had offered to retract his false allegations if PEMG paid him money;

- That PEMG had only raised money from a limited number of Taiwanese banks and had not raised any money since 2008; thus, there was no imminent threat of harm to any entity;

- That PEMG had never missed a payment to any bank and has granted requests for redemptions, in aggregate, of more than $100 million; and,

- That PEMG was, before the SEC's disruption, a going concern overseeing substantial assets, that if held to maturity, could be worth well over $1 billion and be sufficient to pay all the foreign banks that provided capital, plus generate a substantial profit.

Mr. Pang is not Bernard Madoff. He is an individual who deserves the rights that are fundamental to our legal system. He respectfully submits that this case should be proceeding on a different track, and that Mr. Pang should have a trial before he is judged guilty and punished.

As set forth below, because the SEC and the Court lack jurisdiction over transactions between Taiwanese banks and British Virgin Island entities, the case should be dismissed. Alternatively, the Temporary Restraining Order should be dissolved and the SEC should be compelled to litigate this case as it does any other, through the adversary system where both sides are presented and where sanctions are imposed only after the SEC has met its burden of demonstrating wrongdoing.

As an initial matter, the SEC did not adequately show that an *ex parte* proceeding without notice was necessary. *Ex parte* proceedings are strongly discouraged because they are so contrary to the fundamental principles of our

1    adversary legal system.  They should be reserved for extreme cases where the

2    public interest so requires it, and this is not such a case.  None of the Taiwanese

3    banks had complained to the SEC prior to their motion – the motion was based

4    solely on hearsay from a former employee who had been fired.  No assets were in

5    immediate jeopardy – all of the investments overseen by PEMG entities are long

6    term investments, like real estate, that cannot be sold or "dissipated" immediately.

7    No money was being raised from any individual, and no money had been raised in

8    more than a year, so there was no imminent threat of harm.  There were no mom-

9    and-pop investors about to invest their life savings with PEMG.  There simply was

10   no need for the extraordinary remedy of depriving someone of his business, his

11   job, and all of his assets without notice, an opportunity to be heard and an

12   opportunity to challenge the evidence against him.

13           Most importantly, the SEC omitted to tell the Court many essential

14   facts about this matter that, if considered, would have shown that the SEC had not

15   met its burden to justify an *ex parte* proceeding.  In addition to failing to tell the

16   Court about the informant's lack of credibility, the SEC failed to tell the Court that

17   prior to the SEC filing their *ex parte* motion, attorneys for PEMG had pledged their

18   cooperation to the SEC, that the Board of Directors of PEMG had created a Special

19   Committee to investigate the allegations made by the informant, and that the

20   Special Committee had hired Gibson Dunn & Crutcher, a prominent international

21   law firm with former federal prosecutors and SEC enforcement attorneys, to

22   conduct an internal investigation into the informant's allegations.  Had the Court

23   known this information, it would have realized that there was no emergency and

24   certainly no reason to litigate in secret.

25           Second, and equally important, the TRO should be dissolved because

26   the Court lacks jurisdiction over this matter.  The SEC failed to alert the Court that

27   there is a serious question about whether the Court has subject matter jurisdiction

28   in this case.  The money raised in this case came entirely from banks in Taiwan,

LA\1972955.1

3

and was provided entirely to British Virgin Island companies.  None of the money raised by the entities advised by PEMG came from U.S. investors or U.S. financial institutions.   The SEC has no jurisdiction over wholly foreign transactions that all took place outside the United States.  It is inappropriate for the SEC to be seeking to regulate foreign transactions that have nothing to do with U.S. investors.  Furthermore, there is a substantial question as to whether the transactions with the Taiwanese banks involve the sale of securities or whether they are more properly deemed loans.  In short, the SEC and the Court lack jurisdiction because the transactions at issue all took place outside of the United States and they did not involve the sale of securities.

Third, the TRO should be dissolved because the SEC failed to make a threshold showing that PEMG or Mr. Pang had engaged in fraud.  A fraud case requires a showing that the defendant made, with scienter, a material misstatement to an investor that was relied on by the investor in the transaction.  The SEC provided absolutely no real evidence of such a misstatement or any interactions between Mr. Pang and any investor.  Its evidence consists solely of a hearsay declaration, claiming that the former employee and embezzler said Mr. Pang had made misrepresentations to investors, yet in their haste the SEC did not include the actual documents that contained the alleged misrepresentations.

In truth and fact, the actual documents that were used to raise money contained no misrepresentations.  Rather, they contain very broad language that allows PEMG substantial discretion to use the money it raised however it saw fit.  The documents also provide for substantial fees to be paid to PEMG, and PEMG was entitled to do whatever it wanted to do with the fees that it earned, including upgrading their offices.  The only alleged misstatements identified with any particularity are ones allegedly relating to Mr. Pang's biography.  There is absolutely no evidence whatsoever that any of the foreign banks knew of these alleged misstatements when lending money to PEMG or that the alleged

1  misstatements would have been material.

2          The SEC has already caused irreparable harm to Mr. Pang's business.

3  The day it obtained its TRO, it issued press releases proudly implying that the SEC

4  had shut down another Bernie Madoff.  The SEC convicted Mr. Pang in the

5  public's eye, and Mr. Pang will never regain his reputation even if, as he expects,

6  he is vindicated.  Because of all of the publicity generated by the SEC, Mr. Pang is

7  facing two trials: this legal proceeding, commenced in secret, and a trial in the

8  public where the SEC is doing everything it can to damage Mr. Pang's reputation

9  in an effort to restore the reputation of the SEC.  It is simply impossible for Mr.

10  Pang to return to the normal course of his business, and it may be impossible to

11  expect that this litigation will proceed as any normal litigation should proceed

12  because the SEC continues to litigate the case for the media.

13          If the Court will not dissolve the TRO in its entirety, then Mr. Pang

14  respectfully requests that the TRO be modified to lift the freeze on his assets, to

15  allow discovery to proceed on a normal schedule and to be limited at least initially

16  solely to the threshold question of the Court's jurisdiction, and to eliminate any

17  requirement that Mr. Pang provide an accounting or other documents outside of the

18  scope of traditional discovery requests.

19  **II.     STATEMENT OF FACTS**

20          A.     PEMG's Business

21          Mr. Pang is one of the founders and is currently the largest

22  shareholder of PEMG.  (*See, e.g.,* Cebeci Decl. Ex. 1 at 13.)  PEMG, a private

23  company, is the parent company of PEMG, LLC, another private company.

24  PEMG directly or indirectly advises and manages approximately 23 companies

25  incorporated in the British Virgin Islands (collectively, "the BVI Companies").

26  The BVI Companies borrow money from non-U.S. financial institutions, mostly

27  banks in Taiwan.  Using the borrowed money, and pursuant to individualized

28  written agreements with the non-U.S. financial institutions, PEMG, Inc. invests in

1   various opportunities, including but not limited to timeshare real estate and other

2   properties, debt securities, and "life settlements."

3            A life settlement is a contract in which a company buys the rights to

4   the benefits of a life insurance policy and agrees to pay the premiums until the

5   insured dies.  For example, a company may buy the rights to a $100,000 insurance

6   policy from an insured for $60,000, and agree to pay the premiums.  If the insured

7   dies before the company pays $40,000 in additional premiums, the company

8   profits; otherwise it does not.  An insured may enter into such a contract because it

9   provides him or her with cash while they are alive.  In many cases, such as where

10  the insured does not have any living heirs, the insured may prefer to have cash up

11  front than having a beneficiary receive a death benefit.

12           The offering documents provide that the Taiwanese banks that lend

13  money to the BVI Companies receive a set "simple annual interest" rate – ranging

14  from 5.25% to 7.00% – for a specified period of time.  The specific terms of the

15  agreement are negotiated with the institutions and are unique to each BVI

16  Company.  (*See, e.g.,* Cebeci Decl. Exs. 2-4).

17           At the end of the period, the institutions redeem their interests in the

18  BVI Companies and receive their capital back.  PEMG has raised hundreds of

19  million dollars for investment purposes through this process.  Each of the BVI

20  Companies contains monies from one institution and the assets purchased by the

21  BVI Companies are held in custodial accounts.  In many instances, however, a

22  single financial institution holds interests in multiple BVI Companies.  PEMG has

23  never marketed to any individual or any institution in the United States.

24           Through the SEC's precipitous seizure, Mr. Pang has been denied

25  access to PEMG's books and records, and therefore is unable to append documents

26  to this motion, including documents that would detail the purchase and

27  maintenance of the hundreds of millions of dollars of assets held in custodial

28  accounts.  Robert Mosier, the court appointed Receiver, has confirmed in

conversations with counsel that PEMG has actual assets (unlike a traditional ponzi scheme), including life settlement contracts, real estate, a coal mine, and other interests.  He also indicated that the face value of the life settlement contracts held by the BVI Companies may exceed $1 billion.  That is, if all of the insureds covered in those contracts were to die tomorrow, the BVI entities would receive $1 billion.  Although the current liquidation value of the company assets is difficult to estimate with precision (especially if PEMG is forced to liquidate assets in the midst of a global recession and under distressed conditions created by the SEC's action), Mr. Pang respectfully submits that the assets, if held to maturity, would be adequate to cover repayment of the loans from the Taiwanese banks plus a profit.[1] This will be true, however, only if the business, involving complex assets, is managed competently – something the Receiver is ill-suited to accomplish, despite his considerable expertise.  Indeed, Mr. Pang respectfully submits that the business – and its assets – are being impaired daily because the Receiver has no means of making informed decisions about PEMG's daily operations.

Of course, whether or not PEMG is able to pay the Taiwanese banks in full today (based on a forced liquidation of assets in a global recession) is irrelevant to the determination of whether the temporary restraining order is appropriate.  The TRO must be based on a claim of imminent and ongoing fraud, rather than a claim that the investments lost money.  No lender or investor is legally entitled to a guaranteed return of their investment, particularly where, as here, the risks of their investments have been disclosed in writing.

---

[1] The Receiver agreed to meet with Mr. Pang's counsel and provided a very general overview of the categories of assets that the Receiver observed upon seizing control of the business.  Among other things, the Receiver confirmed the existence of the categories of assets described above, but made clear that the process of confirming the existence and value of all assets has not been completed.  Mr. Pang's counsel has made several requests to the Receiver and his counsel for a current balance sheet of the Company or, in the alternative, for a listing of assets held or controlled by PEMG and their cost basis, but that information has not been produced as of this date.

1    PEMG obtained its financing solely from Taiwanese banks and from
2    the capital of Mr. Pang and other owners of the business.  PEMG did not raise
3    money from U.S. investors.

4    B.    SEC Failed To Alert The Court Of  The Language In The Contracts
5          With The Banks

6          The SEC alleged that Mr. Pang defrauded the Taiwanese banks, but it
7    never provided to the Court the agreements with those banks.  The agreements
8    show that PEMG was given broad discretion on how to use the money provided by
9    the banks, and was entitled to substantial fees.

10         Although the relevant agreements between PEMG and the foreign
11   banks contain unique provisions, each contains explicit provisions for the
12   distribution of fees to PEMG, including management fees, transaction fees and the
13   payment of operational expenses.  Even the exhibits appended to the SEC's
14   moving papers, which do not relate to any offering by PEMG, provide for the types
15   of fees described above.[2]  (See, e.g., Cebeci Decl. Ex. 3 at 6-7.)

16         More importantly, as is common with any private entity which may
17   borrow (or raise) funds from banks, the relevant agreements between PEMG and
18   the foreign banks provided PEMG with wide latitude and discretion on how PEMG
19   used the proceeds.  (See, e.g., Cebeci Decl. Ex. 3 at 4.)  Put simply, like any other
20   business, PEMG was, and remains, free to use the funds it borrowed from the
21   banks to execute upon its business plan.

22         As described in the agreements between the BVI Companies and the
23   foreign banks, the companies advised by PEMG intended to, and did, use a portion

24

25   [2]   Attached as Exhibit 2 through 4 to the declaration of Rabia Cebeci are three
26         documents titled Confidential Private Offering Memorandum pertaining to
           Genesis Voyager Equity Corporation.  The ownership charts also appended to
27         the SEC's moving papers make clear that Mr. Pang, and PEMG, have no
           interest in GVEC.  Rather, a PEMG affiliate served only as advisor to GVEC,
28         for which it received a fee.

1   of the proceeds they obtained from the foreign banks to purchase, among other

2   things, life settlement contracts.  These contracts were purchased at a considerable

3   discount, with the BVI Companies agreeing to continue servicing the policies for

4   the remaining lifespan of the underlying insured individual.  Notably, the purchaser

5   assumed the risk that the actuarial projections underlying the discounted valuations

6   might be incorrect, and that the policies might not pay off as soon as projected.

7   Put simply, if the insured individuals died sooner than projected, the BVI

8   Company would enjoy a greater return by virtue of having made fewer premium

9   payments.  Conversely, if the underlying insured individuals outlived the actuarial

10  projections, the BVI Company would enjoy a lesser return by virtue of having

11  made a greater number of premium payments than anticipated.

12          In addition to investing in life settlement contracts, the BVI

13  Companies also used a portion of its proceeds to purchase real estate, including

14  commercial property and timeshares, and to invest in other assets.  As with any

15  other investment or loan, the value of the BVI Companies' asset portfolio at any

16  given time was subject to fluctuations in the marketplace.

17          Despite the global recession, prior to the SEC's precipitous seizure,

18  none of the BVI Companies had ever missed a payment under any of the

19  agreements with the foreign banks.

20      C.   The SEC Proceeded Despite The Fact That PEMG Had Agreed to
21           Cooperate

22          On or about April 15, 2009, the Wall Street Journal reported that Mr.

23  Aboubakare was claiming that PEMG was a Ponzi scheme.  (Cebeci Decl. Ex. 9.)

24  In response to this article, PEMG took all of the steps one would expect a diligent

25  company to take.  It formed a Special Committee (not including Mr. Pang) of the

26  Board of Directors to investigate the allegations.  It hired Gibson, Dunn &

27  Crutcher, and specifically partners who had previously served as federal

28  prosecutors and SEC Enforcement staff, to investigate the matter.  (Mendel Decl. ¶

3.)  Mr. Pang resigned from being Chairman of PEMG and had agreed to cooperate.  (Regenstreif Decl. Exs. 1, 8.)  In fact, when the story broke, Mr. Pang was overseas on a long-planned vacation and he voluntarily returned to address the allegations in the newspaper.

In the week prior to when the SEC filed its motion in secret, Mr. Pang's counsel exchanged emails with the SEC's counsel and informed them that Mr. Pang had returned to the country, that he was prepared to cooperate with PEMG's inquiry, and further proposed setting a time to meet with the SEC once Mr. Pang's counsel had an opportunity to consult with his client.  (Regenstreif Decl. Ex. 8.)  Despite this offer, the SEC proceeded *ex parte* and filed its motion.

### D.    The SEC's Only Witness Is Completely Lacking In Credibility

The SEC's moving papers are premised entirely upon the allegations of Nasar Aboubakare, a former employee of PEMG, with whom the SEC met only once according to Ms. Cebeci's declaration.  Mr. Aboubakare allegedly told the SEC that: (1) Mr. Pang and PEMG falsely represented that the source of profits to pay returns to "investors" would be generated by certain investments, but was, instead, "a $25 million ponzi scheme"; (2) Mr. Aboubakare had created a bogus insurance policy, allegedly at Mr. Pang's direction, which changed the face amount of insurance from approximately $30 million to $100 million[3]; and (3)  PEMG and Mr. Pang had misrepresented Mr. Pang's educational and employment history.

Even though the SEC based its motion exclusively on the word of Mr. Aboubakare, the SEC failed to tell the Court that Mr. Aboubakare was a liar, an embezzler, and that he had engaged in multiple instances of improper sexual

---

[3]    Notably absent from Mr. Aboubakare's hearsay account is any allegation, or information, detailing what Mr. Aboubakare did with the altered insurance policy.  In particular, there is no allegation that the "altered" insurance policy that Mr. Aboubakare created was ever shown to any of the foreign banks or any other alleged PEMG investor.  Nor has the SEC presented any evidence from any investor indicating that they were provided with the policy "altered" by Mr. Aboubakare.

1    harassment while employed at PEMG.

2           In or about February, 2007, PEMG discovered that Mr. Aboubakare

3    was engaged in an ongoing scheme by which he and at least one insurance broker

4    conspired to steal from PEMG at least $3 million raised for the purchase of life

5    settlement policies.  (*See* Regenstreif Decl. Ex. 2 at 11:16-25.)  Mr. Aboubakare

6    controlled the purchase and authorization of payment for policies and he arranged

7    to purchase policies at above fair market value.  The broker who arranged the deals

8    then kicked back to Mr. Aboubakare the amount of the purchase price in excess of

9    the market value.  PEMG confronted Mr. Aboubakare with the allegations, he

10   admitted the fraud, and he returned $3 million of the embezzled funds.  As a result

11   of the embezzlement, in or about March, 2007, PEMG stripped Mr. Aboubakare of

12   the title of Chief Investment Office and relieved him of virtually all managerial and

13   administrative responsibilities.  (*See* Regenstreif Decl. Ex. 2 at 11:26-12:2.)

14          PEMG executives also discovered that Mr. Aboubakare had been

15   sexually harassing PEMG employees, had engaged in improper conduct with

16   subordinates and outside vendors, and on several occasions used corporate funds to

17   travel with them.  (*See* Regenstreif Decl. Ex. 2 at 10:22-11:5.)  PEMG received

18   numerous complaints from employees and clients about Mr. Aboubakare.  Mr.

19   Aboubakare was repeatedly warned about his conduct, and was reprimanded with

20   escalating disciplinary actions.  Ultimately, in August 2007, PEMG terminated Mr.

21   Aboubakare and ultimately sued him.  (*See* Regenstreif Decl. Ex. 2 at Ex. 2 at

22   12:21.)

23          After he was terminated, Mr. Aboubakare became the chief executive

24   officer of a firm involved in the life settlements business and an apparent

25   competitor to PEMG.  (Regengstreif Decl. Ex. 3.)  Mr. Aboubakare's allegations

26   against PEMG have certainly aided Mr. Aboubakare's business.

27          Perhaps most troubling is Mr. Aboubakare's attempt to extract money

28   from PEMG in exchange for retracting the false allegations he had provided to the

1  Wall Street Journal.

2  The Court was entitled to know about the considerable body of

3  evidence that plainly calls into question Mr. Aboubakare's credibility and his

4  propensity to lie. Yet, the SEC omitted any mention of these facts from its *ex*

5  *parte* application. And, having deliberately prevented Defendants from having any

6  opportunity to be heard before seeking a TRO, the SEC ensured that the Court

7  would not learn of Mr. Aboubakare's credibility problems.

8      E.    The SEC Failed to Corroborate Mr. Aboubakare's Claim Regarding
9            The Alleged Ponzi Scheme

10  Separate and apart from omitting any of the facts concerning Mr.

11  Aboubakare's past, the SEC made no effort to corroborate the most damning of

12  Mr. Aboubakare's allegations: namely, that "in late 2006 or early 2007," Mr. Pang

13  allegedly told Mr. Aboubakare and Robert Anderson, PEMG's current chairman,

14  that PEMG was "a $25 million ponzi scheme." Allegedly, Mr. Pang explained to

15  Mr. Aboubakare and Mr. Anderson that the life settlement investments were not

16  performing, and that, as a result, he had to use new monies from the Taiwanese

17  banks to pay interest and/or principal owed on money provided earlier by the

18  Taiwanese banks.

19  Despite being aware of the existence of the Special Committee, and its

20  highly regarded outside counsel, the SEC made no attempt to interview Mr.

21  Anderson or otherwise inquire as to whether Mr. Anderson, the only other alleged

22  participant in the conversation, would corroborate this explosive allegation. Had

23  they done so they would have discovered that Mr. Aboubakare was lying.

24  Immediately after the SEC filed its complaint, Mr. Anderson repeatedly denied that

25  anyone at PEMG, including Mr. Aboubakare or Mr. Pang, had ever suggested that

26  PEMG was a ponzi scheme. (See Mendel declaration ¶ 3.) Indeed, it is not

27  credible to believe that Mr. Anderson, a person who is not affected at all by these

28  allegations, would have heard such a statement and done nothing in response.

1    The SEC also alleged, based solely on Mr. Aboubakare's
2  uncorroborated claim, that "the investors were provided with this bogus insurance
3  policy in order to induce their investment." (Pl. Mem. P. & A. 4:20-12.)  While
4  the SEC cites to paragraph nine of Cebici's declaration at this point of its brief, no
5  such information is contained in that paragraph – or any other paragraph – of the
6  declaration.  There is no credible evidence at all that any forged insurance policy
7  was provided to any of the foreign banks.  Indeed, had the SEC bothered to
8  investigate, it would have discovered that Bank SinoPac, the Taiwanese bank
9  whose loan was used for the purchase of the time share real estate at issue, had
10  never seen the insurance policy that Mr. Aboubakare claims he altered and the
11  SEC claims was provided to investors.  (*See* Regenstreif Decl. Ex. 7.)

12    F.    The SEC Has Provided Absolutely No Financial Evidence Regarding
13          PEMG

14    Perhaps most troubling regarding the SEC's action is the complete
15  absence of any evidence to support the SEC's claim that PEMG is currently
16  operating a ponzi scheme.  Yet, the SEC failed to provide a shred of evidence
17  showing the actual assets of the firm.

18    Moreover, the SEC's allegations are old and stale.  In its moving
19  papers, the SEC quotes Mr. Aboubakare as saying that "Mr. Pang conducted the
20  [$25 million] ponzi scheme in 2006 and 2007." (Cebeci Decl. at ¶ 8.)  Totally
21  absent is any evidence to support the implicit suggestion that PEMG is currently
22  operating a ponzi scheme or, more importantly, is currently raising new investor
23  funds to pay old investors.  Moreover, PEMG entities manage over $1 billion in
24  assets, far in excess of the $25 million alleged by Mr. Aboubakare.  The SEC has
25  provided no explanation why it needed to seize almost $1 billion in assets to
26  address an alleged $25 million ponzi scheme.

27
28

1  III.   **ARGUMENT**

2       A.   The SEC Improperly Sought An *Ex Parte* Temporary Restraining
3            Order

4            The SEC's request for the *ex parte* issuing of a temporary restraining

5  order was unwarranted.  In filing its application *ex parte*, the SEC put the Court in

6  a difficult position.  The SEC gave the Court the impression that there was a high

7  profile emergency that required extraordinary action to protect investors.  In fact,

8  there was no basis at all for the SEC to proceed *ex parte.*

9            Federal Rule of Civil Procedure 65 allows for the issuance of a

10  temporary restraining order without written or oral notice to the adverse party or its

11  attorney in only one limited circumstance.  Such an order may be issued "**only if**

12  specific facts in an affidavit or a verified complaint **clearly show that immediate**

13  **and irreparable** injury, loss, or damage will result to the movant before the

14  adverse party can be heard in opposition, and the movant's attorney **certifies in**

15  **writing any efforts made to give notice and the reasons why it should not be**

16  **required**."  Fed. R. Civ. Proc. 65(b)(1) (emphasis added).

17            1.   *The SEC Made No Showing Of Immediate And Irreparable*
18               *Injury*

19            The SEC offered no specific facts – or even any facts – in an affidavit

20  nor in a verified complaint that *clearly show* immediate and irreparable injury,

21  loss, or damage, as required by the Federal Rules.  The SEC simply stated, in

22  conclusory fashion, that *ex parte* proceedings were appropriate because "the

23  Defendants have been operating a ponzi scheme, are currently holding investor

24  funds, and own assets purchased with investor funds."  (Pl.'s *Ex Parte* Application

25  2:20-21.)

26            Mr. Aboubakare said that Mr. Pang admitted to running a $25 million

27  ponzi scheme in 2006 or 2007, i.e., two to three years ago.  He said nothing about

28  the current operations.  The SEC presented no evidence demonstrating that PEMG

1    was dissipating assets – on the contrary the assets at issue are illiquid and cannot

2    be sold quickly.  The SEC presented no evidence that PEMG was actively raising

3    money from anyone.  The SEC presented no evidence demonstrating that any bank

4    or investor had complained.  The only evidence presented to seize an ongoing

5    business and the entirety of Mr. Pang's estate is the uncorroborated, unverified,

6    antiquated, and clearly false hearsay allegations of a former employee, who stole

7    money, sought to blackmail the Company and then set up a competing firm.

8           The facts known to the SEC before it filed this motion also

9    demonstrate a complete absence of any need to proceed in secret.  The SEC knew

10   from Mr. Pang's counsel that Mr. Pang had voluntarily returned to the U.S. five

11   days previously and was prepared to address Mr. Aboubakare's allegations as

12   reported in the newspapers.  Yet, without even the slightest showing – indeed not a

13   single shred of evidence – the SEC proceeded to this Court without notice to

14   counsel, implied to the Court that Mr. Pang was a flight risk, and requested that the

15   Court take the extraordinary step of seizing Mr. Pang's passport.  The moving

16   papers are simply devoid of any evidence or any citation to support that requested

17   relief.

18          Furthermore, had the SEC made even a single inquiry, it would have

19   determined that the PEMG advised entities had never missed a payment to the

20   foreign banks.  If the Company was not raising money and was still able to pay

21   creditors, by definition it could not have been a ponzi scheme: in other words,

22   there would have been no "new money" to use to pay "old investors."  Yet the SEC

23   never bothered to make any inquiry to the Special Committee or the Company in

24   order to investigate Mr. Aboubakare's claims.

25          The SEC alternatively tried to justify its *ex parte* proceedings by

26   stating, with no supporting evidence, that "[p]rior notice of [the SEC's] action and

27   requested relief would give Defendants **an opportunity** to further dissipate assets."

28   (Pl.'s Mem. P. & A. 2:15-17 (emphasis added).)  Yet Rule 65 requires the SEC to

show when moving for a TRO without Defendants' notice that giving notice "**will result**" in immediate and irreparable damage – not that there is merely an opportunity for assets to be moved or sold.  Under the SEC's reasoning, every case filed they file would warrant *ex parte* proceedings because there will always be "an opportunity" for assets to be sold or moved before a case is concluded.   Yet that is not the law.

> 2.   *The SEC Did Not Establish The Extraordinary Circumstances Necessary to Justify An Ex Parte Proceeding*

"Circumstances justifying the issuance of an *ex parte* temporary restraining order are extremely limited because 'our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted to both sides of a dispute.'"  *MRC Golf, Inc., v. Hippo Golf Company, Inc.*, No. 09-CV 327-L 2009 U.S. Dist. LEXIS 15625, at *7 (S.D. Cal. Feb. 26, 2009) (quoting *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006) (citations omitted).  "Where it is possible to find and serve the adverse party, courts have recognized 'a very narrow band of cases in which *ex parte* orders are proper because notice to the defendant would render fruitless the further prosecution of the action.'"  *Id.* at * 8 (quoting *Reno Air Racing*, 452 F.3d at 1131).

The courts have cautioned strongly against the use of *ex parte* applications.  Then-District Judge Rymer noted that "*ex parte* proceedings pose a threat to the adversary system," and thus a threat to "accuracy, fairness, and consistency."  *In re Intermagnetics Am.*, 101 B.R. 191 (C.D. Cal. 1989).  *Ex parte* applications "contravene the structure and spirit of the Federal Rules of Civil Procedure and the local rules of [the Central District]," both of which contemplate noticed motions should be the rule rather than the exception.  *Id.*  They impose "an unnecessary administrative burden on the court and an unnecessary adversarial burden on opposing counsel who are required to make a hurried response under

1   pressure, usually for no good reason." *Id.* They "put the applicant 'ahead of the

2   pack,' without cause or justification." *Id.*

3          This is precisely what has occurred here.  Mr. Pang already lost this

4   case before he ever had notice of the allegations.  His business and all of his

5   personal assets are taken, and the SEC even wants to prevent him from using his

6   money to hire a lawyer.  (Regenstreif Decl. Exs. 4-6.)  Because the SEC failed to

7   justify its *ex parte* action, the TRO should be dissolved and the case should

8   proceed on a different track – one that will assure Mr. Pang of the basic rights

9   guaranteed by due process and one that comports with the traditional discovery

10  rules laid out in the Federal Rules of Civil Procedure.

11         B.   This Court Lacks Jurisdiction To Enter and To Enforce The
12              Temporary Restraining Order

13         The SEC failed to provide sufficient allegations to establish that the

14  Court has jurisdiction to hear this case or to issue the temporary restraining order.

15  A court has jurisdiction over securities cases only when there is conduct or effects

16  within the United States.  *Grunenthal GmbH v. Hotz*, 712 F.2d 421 (9th Cir. 1983).

17  Here, PEMG advised British Virgin Island companies that raised money from

18  Taiwanese banks.  The SEC has not identified any U.S. investor that was harmed

19  by the transactions with the Taiwanese banks.  As a result, there are no "effects" in

20  the United States as a result of the alleged conduct.

21         There is also no "conduct" within the United States that could give

22  rise to jurisdiction.  Conduct is sufficient to create jurisdiction only if it is

23  significant with respect to the alleged violation, it involves interstate commerce,

24  and it furthers the fraudulent scheme.  *Id.* at 424-25.  The SEC has identified no

25  such conduct.  There is no allegation that PEMG or Mr. Pang negotiated

26  agreements with the Taiwanese banks in the United States, signed agreements with

27  the Taiwanese banks in the United States, or otherwise made a misrepresentation to

28  the Taiwanese banks in the United States.

1    The mere fact that plaintiffs allege that defendants engaged in certain

2    acts in the United States is by no means sufficient to confer subject matter

3    jurisdiction.   For example, in *Butte Mining PLC v. Smith*, 76 F.3d 287 (9th Cir.

4    1996), plaintiffs described at least four acts by defendants that took place in the

5    U.S., but the court found that there was no subject matter jurisdiction because,

6    among other reasons, the conduct in the U.S. was "merely preparatory."  That

7    conduct included the purchase of land in the U.S., the formation of corporations

8    and shell companies in the U.S., payments made in the U.S., and communications

9    using systems in the U.S.

10    Similarly, in obtaining the temporary restraining order here, the SEC

11    alleged that PEMG is organized under Nevada law and located in Irvine, and that

12    some of the investments made by PEMG involved U.S.-based property.  These

13    allegations do not begin to show that this Court or the SEC has subject matter

14    jurisdiction.

15    In the end, this is a case about British Virgin Island companies

16    allegedly defrauding Taiwanese banks (none of whom complained to the SEC).

17    Indeed, in some instances, PEMG's only role was to provide investment advice to

18    Taiwanese investment managers who obtained money from Taiwanese banks.

19    The SEC does not have jurisdiction to bring such an action, and therefore the Court

20    does not have jurisdiction to determine this dispute.  On this basis alone, the

21    temporary restraining order should be dissolved, and this action should be

22    dismissed.

23    We also note that there is a substantial question whether any of the

24    transactions between the British Virgin Island Companies and the Taiwanese banks

25    involved "securities" as defined in the statute.  15 U.S.C. § 77b(a)(1); 15 U.S.C. §

26    78c(a)(10).  The SEC put the wrong documents before court, as the Taiwanese

27    banks typically lent money to the BVI Companies.  If these loans are not securities

28    as defined in the statute, then the Court and the SEC would have no jurisdiction to

1  proceed.  *See, e.g., SEC v. Belmont Reid & Co., Inc.*, 794 F.2d 1388 (9th Cir. 1986)

2  (affirming district court's grant of summary judgment upon a finding that the

3  instruments at issue were not securities as defined by the Securities Act and

4  Securities Exchange Act).  Because Mr. Pang has been deprived of access to

5  PEMG's documents, he cannot fully analyze the issue for the Court, except to note

6  that there is a substantial question as to whether or not any "securities" were

7  actually sold in this case.

8    C.    The SEC Failed To Meet The Standard For A Temporary Restraining

9          Order

10           In order to obtain a temporary restraining order, the SEC must

11  establish:  (a) a *prima facie* case that a violation of the securities laws has occurred,

12  (b) a reasonable likelihood that the violation will be repeated, and (c) a

13  "probability of success" on the merits and a possibility of irreparable injury.  *See*

14  Pl.'s Mem. of P. & A.  at 5-6, citing *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d

15  1195, 1199 n.2 (11th Cir. 1999); *SEC v. United Financial Group, Inc.*, 474 F.2d

16  354, 358-359 (9th Cir. 1973).  *See also United States v. Nutri-Cology, Inc.*, 982

17  F.2d 394, 398 (9th Cir. 1992).[4]   The SEC has not met any of these standards.

18    1.    *The SEC Has Not Made A Prima Facie Showing Of A Violation*

19          *Of The Securities Laws*

20           To make out a *prima facie* case for its claims under Section 17(a) and

21  [4]  According to the 9th Circuit in *Nutri-Cology*, "[g]enerally, to obtain a
22  preliminary injunction, the moving party must show either (1) a combination of
     probable success on the merits and the possibility of irreparable injury or (2)
23  that serious questions are raised and the balance of hardships tips in its favor. . .
     . These two formulations represent two points on a sliding scale in which the
24  required degree of irreparable harm increases as the probability of success
     decreases. . . . In statutory enforcement cases where the government has met the
25  'probability of success' prong of the preliminary injunction test, we presume it
     has met the 'possibility of irreparable injury' prong because the passage of the
26  statute is itself an implied finding by Congress that violations will harm the
     public." *Nutri-Cology, Inc.*, 982 F.2d at 398 (internal citations and some
27  quotation marks omitted).  Thus, if the government fails to "show that it would
     probably prevail on the merits," it is "not entitled to a presumption of
28  irreparable injury." *Id.*

Section 10(b) and Rule 10b-5, the SEC must prove: (1) a material misstatement or omission (2) in connection with the offer or sale (or purchase or sale) of a security (3) by means of interstate commerce. *See SEC v. Phan*, 500 F.3d 895, 907-08 (9th Cir. 2007); *White v. Abrams*, 495 F.2d 724, 729 (9th Cir. 1974) (quoting *Royal Air Properties, Inc. v. Smith*, 312 F.2d 210, 212 (9th Cir. 1962)); 15 U.S.C. § 77q(a); *Grunenthal GmbH v. Hotz*, 712 F.2d 421 (9th Cir. 1983). The evidence must be sufficient "to get a plaintiff past a motion for a directed verdict in a jury case or motion to dismiss pursuant to Fed. R. Civ. P. 41(b) in a nonjury case. It is the evidence necessary to require a defendant to proceed with his case." *White v. Abrams*, 495 F.2d at 729.

The SEC has not even remotely met this standard. It has not identified any material misstatement with any particularity. Its only allegation is that Mr. Aboubakare said that at an unspecified time Mr. Pang made misrepresentations to unspecified Taiwanese banks about how the money they provided to BVI entities advised by PEMG would be invested. The SEC has not even met the standard to *plead* fraud, much less the standard to show a *prima facie* case.

As described above, there is no evidence of any misrepresentation in connection with the sale of a security. There is a serious question whether the money raised from Taiwanese banks was done through "securities" or through loans that would not constitute securities. There is no evidence that any misrepresentation was made at the time of any transaction between the BVI entities and any of the Taiwanese banks. Finally, there is no evidence that any misrepresentation was made in the United States, much less through interstate commerce.

> ### 2. *The SEC Did Not Show A Likelihood That Any Alleged Fraud Was Ongoing Or Would Be Repeated*

It is undisputed that PEMG was not raising any money at the time the

1   SEC filed its *ex parte* motion.  None of the Taiwanese banks were imminently

2   going to make more loans.  PEMG had not raised money since 2008.

3          The SEC submitted to the Court newspaper articles about Mr.

4   Aboubakare's allegations, and even attached them as evidence in support of their

5   motion.  (Cebeci Decl. Exs. 9-11.)  We are not aware of any case law that suggests

6   a newspaper article is sufficient evidence to support a temporary restraining order.

7   Unfortunately, the SEC did not tell the Court about Mr. Pang's and PEMG's

8   reaction to the newspapers, i.e., his return from China and the creation of the

9   Special Committee, which is far more telling evidence about the threat of any

10   imminent harm.  Mr. Pang and PEMG handled the newspaper articles as one would

11   expect a responsible company and executive would – they hired counsel, agreed to

12   conduct an investigation, and removed Mr. Pang from positions that would have

13   any influence over that investigation.  This is how *public companies* typically react

14   to such allegations.  Here, PEMG is a private company that had absolutely no

15   obligation to act in that manner.  In fact, Mr. Pang controls over half the

16   Company's shares.  He did not need to resign from his management positions, hire

17   Gibson Dunn & Crutcher or agree to any investigation.  He could have fought from

18   the beginning.  His decision to do the right thing was affirmatively withheld from

19   the Court.

20          In lieu of providing evidence, the SEC instead resorted to hyperbole,

21   stating that the "brazen and egregious" nature of the Defendants' fraudulent

22   conduct requires injunctive relief.  (Pl.'s Mem. P. & A. 13:6.)  Appending dramatic

23   adjectives to the uncorroborated hearsay statements of an embezzler does not

24   improve the nature of the evidence.  Rather, it is like putting the proverbial

25   "lipstick on a pig."

26          3.   *The SEC Has Not Shown A Probability of Success On The*
               *Merits*

27

28          The SEC has not remotely shown a probability of success on the

1   merits.

2            a.      *The SEC Relied on Mr. Aboubakare, and His Testimony*
3                    *Has No Credibility or Evidentiary Value*

4            The SEC relied almost exclusively on Mr. Aboubakare's

5    uncorroborated hearsay statements in alleging that Mr. Pang and PEMG made

6    misrepresentations of material fact.  There clearly is no probability of success on

7    the merits when the entire case is based on the hearsay statement of one witness.

8    *Cf. Feed Management Systems, Inc. v. Brill*, No. 06-4126 2006 WL 3247195 (D.

9    Minn. 2006) (finding no probability of success on the merits in breach of contract

10   case where among other issues the only evidence presented of customer confusion

11   was hearsay statements from single affiant).

12           Mr. Aboubakare is not, however, just an ordinary witness.  He is an

13   informant who committed a major crime by embezzling over $3 million and who

14   offered to retract his false allegations for money.  Courts have for decades warned

15   of the dangers of relying on informants.  Ninth Circuit Judge Trott, a former

16   federal prosecutor, has in multiple opinions and articles warned government

17   attorneys about the dangers of relying on individuals like Mr. Aboubakare.  His

18   advice is the following:

19           Mistrust everything [the witness] says.  Be actively
             suspicious.  Look for corroboration on everything you
20           can; follow up on all indications that he may be fudging .
             . . Assess the motivation of the witness.

21
22   Judge Stephen S. Trott, *Words of Warning for Prosecutors Using Criminals as*

23   *Witnesses*, 47 Hastings L. J. 1381, 1406 (1996).  The SEC did absolutely none of

24   this basic work that any government enforcement lawyer should do when dealing

25   with a criminal informant.

26           Courts have dismissed criminal cases that were based on the

27   uncorroborated statements of one informant.  *Lyda v. United States*, 321 F.2d 788,

28   795 (9th Cir. 1963) (explaining that "there comes a point where the witnesses

LA\1972955.1                                                    Case Number: CV09-2901 PSG (Ex)

22

1   qualifications are so shoddy that a verdict of acquittal should have been directed.")

2   In addition, courts in civil cases have expressed grave reservations about the

3   credibility of individuals like Mr. Aboubakare.  *See, e.g. Lindquist & Vennum*

4   *P.L.L.P. v. Speciale*, No. 05-CV-0597 2008 U.S. Dist. LEXIS 25128, at *18 (D.

5   Minn. 2008) (finding a witness's testimony that was "almost comical in its

6   dishonesty and evasiveness" to not be credible).  The uncorroborated statements of

7   a liar, who offers to retract his false statements for money, have little evidentiary

8   value.

9             b.     *The SEC Failed To Prove Any Misstatement With Regard*

10                  *To The Use Of Funds*

11          The SEC failed to prove any misstatement regarding the use of funds

12   raised from the Taiwanese banks.  The SEC, quoting Mr. Aboubakare, alleges that

13   PEMG lied to the Taiwanese banks about how funds raised would be invested by

14   telling them that funds would be used to buy timeshare properties when in fact the

15   funds were used to pay obligations on life insurance contracts.  Unfortunately, the

16   SEC did not provide the specific documents that contained the specific

17   misrepresentations, and on this basis alone they have failed to meet their burden of

18   showing a probability of success on the merits.

19          The actual documents used to raise money from the banks, only a few

20   of which have been made available to Mr. Pang's counsel, make clear that there

21   were no such lies.  The loan agreements used with the banks contain very broad

22   language that allows the BVI Companies advised by PEMG broad discretion in

23   how to use the funds.  For example, one document states that the funds raised can

24   be used for:

25          (i) [R]eal estate and real estate contracts; (ii) diverse
           portfolio of privately held business assets…(iii) securities
26          issued by technology-related and other companies,
           private and public…(iv) asset-backed funding to
27          qualified companies in various industries; (v) other
           opportunities Manager believes represent growth and
28          profit.

LA\1972955.1

23

Cebeci Decl., Ex. 3, at 4.  When the court looks at the actual evidence, rather than the hearsay of the embezzler, it will see that the SEC failed to meet its burden.

c.   <u>*The SEC Failed to Show Misappropriation of Assets*</u>

With all of the controversy regarding excessive pay on Wall Street, the SEC added in their motion convenient allegations from the embezzler that PEMG spent excessively by redecorating an office and buying a private plane. The SEC makes these assertions as if such expenditures are by definition fraud, *res ipsa loquitur.*  In fact, PEMG earned substantial fees from its business and was entitled to spend those fees however it wished.

Although Mr. Pang has still not been provided with a complete set of the documents reflecting transactions with the Taiwanese banks, the limited universe provided to his counsel, demonstrate that, like any investment advisor, PEMG earned fees on the money raised for investment.  For example:

- Management fees of approximately 1.5% of the amount under management
- Start and organizational fees ranging between .75% and 1.25% of the total amount raised
- Transaction, consulting and management fees from the BVI entities

Given the sizable amounts of money under management, it is clear that PEMG was entitled to, and earned, tens of millions of dollars, which it was free to use as it deemed fit.  The owners of PEMG also contributed their own capital to the business, which again they were entitled to spend however they wish.

The SEC provided no real evidence that these expenditures were illegal or even violated a fiduciary duty.  The SEC failed to articulate to whom, if anyone, PEMG owed a fiduciary duty – to the shareholders of PEMG (the largest of whom is Mr. Pang), to the BVI Companies, or to the Taiwanese banks.  Even if there were a breach of fiduciary duty, that is not sufficient to justify a restraining

order.  The SEC was required to show – but did not – that Danny Pang intentionally or recklessly deceived an investor.  *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977) (alleging breaches of corporate fiduciary duty fails to state claim under Section 10(b) or Rule 10b-5).  Even accepting the allegations about lavish expenditures as true, they are not properly subject to an SEC enforcement action under the antifraud provisions of the federal securities laws.

        d.    ***The SEC's Actions Were Not Based On Evidence From Of The Allegedly Victimized Taiwanese Banks***

There is no evidence to suggest that the SEC spoke with any of the Taiwanese banks that were allegedly the victims of the fraud before it took the extraordinary step of taking over Mr. Pang's business and his life.  Mr. Aboubakare had already generated substantial publicity by reporting his allegations to the press weeks before the SEC filed its motion, yet none of the Taiwanese banks had brought a lawsuit against PEMG or Mr. Pang.  Instead, the Taiwanese banks were meeting with PEMG to hear their response to the allegations before taking action.  The approach of the alleged victims who had invested hundreds of millions of dollars with Mr. Pang is in marked contrast to the approach taken by the SEC, which convicted Mr. Pang before any investigation.

Ironically, the SEC's acts have actually harmed the Taiwanese banks and they threaten to do more immediate harm because the Receiver is not qualified to run PEMG's business.  The SEC has banned Mr. Pang from continuing to run the business or negotiate with the Taiwanese banks.   The SEC also induced the Court to enter an order requiring Mr. Pang to repatriate assets from Taiwan or China to the United States, yet all of the alleged victim banks are in Taiwan.  If Mr. Pang complies with the Court's order, he will be moving assets further away from the alleged victims in this case, and potentially putting the assets out of reach of the victims.  In addition, the SEC has barred the Taiwanese banks from bringing their own lawsuits, and has now forced the Taiwanese banks to obtain redress for

any alleged fraud through the SEC's action in the United States courts, rather than in the forum of their choice with the lawyers of their choice.  This is an unprecedented exercise of extra-territorial jurisdiction that serves no valid interests in the United States.

e.   *The SEC Failed to Allege or Show That the Alleged Misstatements Regarding Education and Employment Were Material or Made to Investors*

The SEC also failed to demonstrate that Mr. Pang ever made misstatements about his background to any investor.  Even if such statements were made, they would not be misstatements of *material* fact.  "It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant."  *Basic, Inc. v. Levinson*, 485 U.S. 224, 238 (1988).  A fact is material if there is "a substantial likelihood that the disclosure of the . . . fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. "  *Id.* at 231-32.

The SEC makes no claim, much less a showing, as to the materiality of the supposed misstatements regarding Mr. Pang's education and employment history or that these alleged misstatements were made to any Taiwanese bank by Mr. Pang.  (*See* Pl.'s Mem. P. & A. 10:12-11:12.)  Thus these allegations cannot help the SEC demonstrate a *prima facie* case of securities fraud or a probability of success on the merits.  *Cf. Greenhouse v. MCG Capital Corp.*, 392 F.3d 650 (4th Cir. 2004) (misrepresentation of chief executive officer's educational background held immaterial as matter of law).  Neither is "management integrity" in general a sufficient reason to find such a misstatement material.  *Id.* at 660.

4.   *The SEC Did Not Establish A Possibility of Irreparable Harm*

If the SEC is only able to make a "colorable evidentiary showing" of a violation, then it needs to make a showing of irreparable harm before it can obtain emergency injunctive relief.  *See Nutri-Cology*, 982 F.2d at 398; *SEC v. Credit*

*First Fund, LP*, No. CV-05-8741, 2006 U.S. Dist. LEXIS 96697, at *6-7 (C.D. Cal. Feb. 13, 2006) (applying heightened requirement in *Nutri-Cology* to SEC enforcement actions).  For the reasons articulated above, the SEC has made no showing of any irreparable harm.  If there is any fraud in this case, it can be litigated through the normal course of litigation that will provide Mr. Pang with due process.

> D.      The SEC Failed To Plead Fraud With Particularity

In order to obtain a temporary restraining order based on a fraud claim, the SEC must plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b).  Rule 9(b) states that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  To meet this standard, the plaintiff must allege the "who, what, where, when, and how" of the fraudulent conduct. *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1106 (9th Cir. 2003).  The SEC's Complaint falls well short of this requirement.

The SEC's motion (and complaint) contains no details regarding the alleged fraud.  The SEC does not identify:  (a) which bank was defrauded, (b) which document given to the bank, if any, contained a misrepresentation, (c) the alleged misstatement, (d) why the alleged misstatement was false, and (e) whether the bank relied on the misstatement.  The motion essentially argues that Nasar Aboubakare says it's true, so it must be true.  This is not remotely close to what is required to be alleged in fraud cases. *Id.*

> E.      In the Event the Order Is Not Dissolved In Its Entirety, The Court
>         Should Modify the Order To Provide Mr. Pang With A Fair
>         Proceeding

The SEC has so poisoned Mr. Pang's business that it will be impossible for the business to return to normal operations anytime soon, if ever.  In addition, by generating so much pre-trial publicity the SEC has made it difficult for the parties and the Court to focus on the merits of the case, which are all that

1  matter.

2          In the event the Court is reluctant to dissolve the order in its entirety,

3  we ask for at the very least the following relief which is fundamental to Mr. Pang's

4  right to due process.

5          1.  *Mr. Pang Should Be Allowed To Attend To His Business*

6          The SEC's order prohibits Mr. Pang from obtaining access to his

7  documents and his business.  As we write this motion, the SEC is meeting secretly

8  with the Receiver and Mr. Pang's employees, and developing further evidence for

9  its case.  Mr. Pang and his counsel are completely excluded from this process.

10          This is not how litigation in this country is supposed to work.  His

11  business and assets should not be seized without at least affording him an

12  opportunity to defend himself.

13          2.  *The Asset Freeze Against Mr. Pang Should Be Modified*

14             *Substantially*

15          Paragraphs IV and V of the Order imposes an asset freeze on all of

16  PEMG's, PEMG LLC's, and Mr. Pang's assets.  The freeze on Mr. Pang's assets is

17  unnecessary and dramatically overbroad.  Mr. Aboubakare's uncorroborated

18  claims alleged only a $25 million "ponzi scheme," yet assets far in excess of that

19  have been seized from the business and all of Mr. Pang's assets have been frozen.

20  The freeze on Mr. Pang's assets as articulated in paragraphs IV and V of the order

21  should be lifted in its entirety as to Mr. Pang.

22          While courts have equitable power to freeze assets, such a drastic

23  measure should be used sparingly and with great caution.  As a result of the asset

24  freeze temporarily ordered by the Court, Mr. Pang cannot access funds to support

25  his daily needs and or his legal defense.

26          Courts have discretion to modify asset freezes.  *SEC v. McMillan*, No.

27  CV-06-0951 2006 U.S. Dist. LEXIS 89150, at *1-2 (D. Ariz. Dec. 7, 2006).  In

28  *FSLIC v. Sahni*, 868 F.2d 1096, 1097 (9th Cir. 1989), the Ninth Circuit held that

1  "the proper standard for the district court to apply in deciding whether to issue a

2  freeze is whether [the government] has shown a likelihood of success on the merits

3  and a possibility of dissipation." *Sahni*, 868 F.2d at 1097.  As discussed above, the

4  SEC has not shown either a possibility of success on the merits or of dissipation.

5       The asset freeze is also dramatically overbroad.  The primary purpose

6  of an asset freeze is to facilitate compensation of allegedly defrauded investors in

7  the event a violation is established at trial.  *SEC v. Gonzalez de Castilla*, 170

8  F.Supp.2d 427, 429 (S.D.N.Y. 2001).  An asset freeze is used to "preserve

9  sufficient funds for the payment of a disgorgement award." *SEC v. Lauer*, 445 F.

10 Supp. 2d 1362, 1367 (S.D. Fla. 2006); *see also SEC v. ETS Payphones, Inc.*, 408

11 F.3d 727, 734-35 (11th Cir. 2005) (finding that an asset freeze was supported by

12 the record because the frozen assets were less than the potential disgorgement).

13      Frozen assets should be equal to or less than the potential

14 disgorgement.  The amount of assets frozen is determined by a reasonable

15 approximation of the amount the defendant was allegedly unjustly enriched.

16 *Lauer*, 445 F.Supp.2d at 1370 (citing *ETS Payphones, Inc.*, 408 F.3d at 735-36).

17 The Third Circuit has held that "the court must make some attempt reasonably to

18 relate the value of the assets encumbered to the likely value of the expected

19 judgment." *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 198 (3rd Cir.

20 1990) (unfreezing assets because of the overly broad scope of the freeze).

21      Here, the SEC has provided the Court with no estimation of an

22 expected judgment.  Instead, it simply requested that all the assets be frozen, and

23 that all assets anywhere in the world be repatriated.  (Pl.'s Mem. P. & A. 14:2-13.)

24 This request is a gross overestimate.  The *Hoxworth* court explained that the

25 purpose of a freeze is to protect a likely judgment, so a freeze that involves funds

26 that are not part of the possible final decree harms a defendant more than is

27 necessary.  *Hoxworth*, 903 F.2d at 198 (citing *DeBeers Consol. Mines, Ltd. v.*

28 *United States*, 325 U.S. 212, 220 (1945)).

1    It is also not enough for the Receiver to say that the current,

2    liquidation value of the portfolio may be inadequate to fully redeem all the

3    outstanding notes.   If that was the standard, every investment fund in the world,

4    and every business, would be subject to seizure.

5    Finally, the asset freeze has affected Mr. Pang's right to counsel.  A

6    district court has broad discretion with respect to permitting a defendant to use

7    frozen assets to pay attorneys' fees.  *See CFTC v. Noble Metals Int'l*, 67 F.3d 766,

8    775 (9th Cir. 1995) (within court's discretion it may limit payment of attorney fees

9    out of frozen assets out of concern for preserving funds for ultimate distribution to

10   defrauded customers).  Courts have granted modifications of asset freezes to

11   permit defendants to retain counsel on their behalf.  *See, e.g., SEC v. Grossman*,

12   No. 87 Civ. 1031 2003 U.S. Dist. LEXIS 317, at *16 (S.D.N.Y. 2003) (noting that

13   the asset freeze was modified to permit the payment of attorneys' fees); *SEC v.*

14   *Int'l Loan Network, Inc.*, 770 F. Supp. 678, 680 (D.D.C. 1991) (noting that it had

15   granted a modification of the freeze to permit defendants to retain counsel).

16   In *Gonzalez de Castilla*, the district court found it was appropriate to

17   modify the asset freeze to permit the payment of legal fees because the defendants

18   had a legitimate challenge to the SEC's evidence.  *Gonzalez de Castilla*, 170 F.

19   Supp. 2d at 430.  Even when the frozen assets are substantially smaller than the

20   potential disgorgement, courts have allowed a defendant access to his funds in

21   order to pay for attorneys' fees.  *See, e.g., FTC v. World Wide Factors*, 882 F.2d

22   344, 348 (9th Cir. 1989) (limiting attorneys' fees "out of concern for preserving

23   funds for ultimate distribution").  In *World Wide Factors*, the Ninth Circuit held

24   that if a court is concerned about preserving funds for potential distribution to

25   investors, the court should either set a maximum total sum which can be

26   withdrawn or establish a minimum size to which the otherwise frozen assets may

27   be reduced based upon appropriate findings.  *Id.* at 348.

28   As discussed above, the frozen assets are substantially larger than the

1   potential disgorgement associated with Mr. Aboubakare's allegations.  Therefore,

2   the concern for preserving the funds for potential distribution is not applicable in

3   this situation.  Furthermore, Mr. Pang has a valid, complicated defense that he

4   needs professional assistance to mount.  Accordingly, Mr. Pang is entitled to

5   access his money to fund his legal defense.

6          3.   *The Court Should Schedule A Hearing To Determine If A*
7               *Receiver And An Asset Freeze of PEMG Is Truly Necessary*

8          It is clear that the SEC lacked a sufficient basis for appointing a

9   Receiver or freezing PEMG's assets.  The imposition of a receivership on a

10  corporation is a drastic measure, and the detrimental business effects should be

11  carefully considered.  *SEC v. Spence & Green Chemical Co.*, 612 F. 2d 896, 904

12  (5th Cir. 1980).  The SEC did not engage in any such balancing.  In *Insussary v.*

13  *Adminstaff Cos.*, No. 98-Civ. 5404 1999 U.S. Dist. LEXIS 7154, at *8 (S.D.N.Y.

14  1999), the court found that plaintiffs failed to sustain the high burden required for

15  the appointment of a receiver because they did not demonstrate that there was a

16  genuine emergency that defendants would squander assets, or that any fraudulent

17  activities were occurring at the defendant company that required the

18  "extraordinary" remedy of a receiver.  *Insussary v. Adminstaff Cos.*,  1999 U.S.

19  Dist. LEXIS 7154at *8.

20          The same is true here.  There was no emergency at PEMG.  PEMG

21  manages assets worth approximately $1 billion.  The allegations of fraud are

22  untrue.  There is no evidence that anyone is squandering assets.  The SEC argued

23  that the appointment of a receiver was necessary "to ensure that the distribution of

24  investor funds is done equitably, orderly and promptly."  (Pl.'s Mem. P. & A.

25  14:24-25.)   This was absolutely not true.  The money in the BVI Funds need not

26  be "distributed" at all; in fact, it may be in the best interests of the foreign banks

27  and the owners of PEMG (including Mr. Pang) to hold the current assets to

28  maturity.  Someone needs to make an investment decision regarding these assets.

1   That investment decision should have been made by the people with a vested

2   interest in the business – i.e., Mr. Pang and the Taiwanese banks, who were

3   discussing the action before the SEC moved unilaterally.  This important decision

4   should not be made by a Receiver that is unfamiliar with the business or by the

5   SEC that has clearly illustrated a lack of judgment and objectivity.

6          Unfortunately it is too late to undo the damage done by the SEC.  At

7   this point, the Receiver has been working at the business for over a week, has

8   changed all of the locks, has diverted the email, and is attempting to run a business

9   with which he is totally unfamiliar.  All of PEMG's companies and lenders are

10  well aware of the Receiver as a result of the SEC's media campaign.

11         Mr. Pang has no real idea what the Receiver has done with Mr. Pang's

12  business.  Mr. Pang is entitled to an opportunity to meet with the Receiver to

13  determine what has occurred at the business, and to determine how best the

14  business should be managed going forward.  It is also clear that the Court has the

15  power to terminate the Receiver or modify his appointment accordingly.

16         The Court in *Spence & Green Chemical Co.* cautioned that a

17  receivership should be terminated and control returned to those who own the

18  business as soon as the reason for its imposition ceases.  *Spence & Green Chemical

19  Co.*, 612 F. 2d at 904.  Mr. Pang therefore requests that, if the Court is unwilling to

20  dissolve the TRO in its entirety, that the Order be modified to require the Receiver

21  to meet with counsel for Mr. Pang and to provide ongoing reports to Mr. Pang.  We

22  also request that the Court hold a hearing within two weeks to determine whether

23  the Receiver should remain in place.  PEMG needs experienced people familiar

24  with these sophisticated investments to manage the business, and there is concern

25  that the Receiver, while skilled at liquidations and distributions, may not have the

26  skills to operate a sophisticated investment management company.

27         The asset freeze on PEMG should also be reconsidered.  In some

28  circumstances, maintaining a freeze might thwart the goal of compensating

LA\1972955.1

Case Number: CV09-2901 PSG (Ex)

1   investors if the freeze were to cause such disruption of a defendant's business

2   affairs that the defendant would be financially destroyed.  *SEC v. Manor Nursing*

3   *Ctrs., Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972).  Therefore, the disadvantages and

4   possible deleterious effects of a freeze must be weighed against the considerations

5   in favor of a freeze.  *Id*.  The SEC did not engage in any such balancing act.

6            PEMG has substantial assets that require maintenance.  A significant

7   percentage of these assets are life insurance policies on which premiums must be

8   paid.  While PEMG assets are frozen, the company cannot pay these premiums,

9   and these assets will decline in value – harming the same institutional customers

10   the SEC claims to be protecting.

11                    4.   *Paragraphs XIII and XV Allowing the SEC Access to PEMG*
                            *and Requiring An Accounting Should Be Deleted*
12

13            The Order allows the SEC to have continuing access to PEMG

14   (paragraph XIII) and requires Mr. Pang to submit an accounting to the SEC

15   (paragraph XV).  These requirements should be eliminated.  After having misled

16   and submitted incomplete information to the Court, the SEC should not be able to

17   have unfettered access to Mr. Pang's business, nor should it be allowed to create ad

18   hoc procedures not called for in the local Rules.  The SEC should be required to

19   use the discovery tools that are available in the normal course of litigation.

20                    5.   *Paragraph XVI Regarding Expedited Discovery Should Be*
                            *Eliminated*
21

22            The Order allows the SEC to obtain the tactical advantage of

23   expedited discovery against Mr. Pang, who has his hands tied behind his back

24   because of the asset freeze and the lack of access to any witnesses or documents.

25   Discovery should proceed in the normal course of litigation.

26                    6.   *Paragraph XVIII Requiring Repatriation of Assets Should Be*
                            *Deleted*
27

28            Paragraph XVII requires PEMG and Mr. Pang to repatriate all of their

1   assets in any foreign locations to the Court.  Mr. Pang does not know why the SEC

2   wants the Court to take custody of a coal mine in China, or other overseas assets.

3   This paragraph should be deleted in its entirety.

4              7.   *Travel Restriction And Passport*

5              Page 13 of the Order has misnumbered paragraphs that restrict Mr.

6   Pang's travel and require him to return his passport.  There has been no showing

7   whatsoever that Mr. Pang is a flight risk.  Finally, Mr. Pang's voluntarily return

8   from China after the news articles were published illustrate the he is not a flight

9   risk.  These provisions should be eliminated as well.

10  **IV.**    <u>**CONCLUSION**</u>

11             The SEC has punished Mr. Pang without a trial and without even

12  allowing him to spend his own money to hire a lawyer, based solely on hearsay

13  from an inherently unreliable embezzler.  It has done so in an obviously tense

14  political climate where the SEC has been criticized and scrutinized for having

15  allegedly failed in its mission of protecting investors.  It is precisely in these cases

16  that Courts with life tenure can force the government to ignore politics and to

17  proceed fairly and impartially.  Mr. Pang respectfully submits that the case should

18  be dismissed or, in the alternative, that the temporary restraining order should be

19  dissolved, and this case should be litigated like any other, with Mr. Pang being

20  afforded the rights that are inherent to legal system.

21

22  Dated:  May 4, 2009

23                                           LATHAM & WATKINS LLP

24

25                                           By /s/ David J. Schindler
                                                 Attorneys for Defendant
26                                               Danny Pang

27

28