LATHAM & WATKINS LLP
   David J. Schindler (Bar No. 130490)
   *david.schindler@lw.com*
   Manuel A. Abascal (Bar No. 171301)
   *manny.abascal@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763

Attorneys for Defendant Danny Pang

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                Plaintiff,<br><br>        vs.<br><br>PRIVATE EQUITY MANAGEMENT GROUP, LLC; PRIVATE EQUITY MANAGEMENT GROUP, INC.; and DANNY PANG,<br><br>                Defendants. | CASE NO. CV09-2901 PSG (EX)<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISSOLVE TEMPORARY RESTRAINING ORDER, OR IN THE ALTERNATIVE TO MODIFY GRANT OF EXPEDITED DISCOVERY AND TO AMEND ORDER FREEZING ASSETS<br><br>[Hearing: TBD] |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................ 1

II.  STATEMENT OF FACTS .................................................................. 3

  A.  PEMG's Business ................................................................... 3

  B.  SEC Failed To Alert The Court Of The Language In The Contracts With The Banks .................................................... 5

  C.  The SEC Proceeded Despite The Fact That PEMG Had Agreed to Cooperate ......................................................................... 7

  D.  The SEC's Only Witness Is Completely Lacking In Credibility ........ 7

  E.  The SEC Failed to Corroborate Mr. Aboubakare's Claim Regarding The Alleged Ponzi Scheme ................................. 9

  F.  The SEC Has Provided Absolutely No Financial Evidence Regarding PEMG ................................................................ 10

III.  ARGUMENT ..................................................................................... 10

  A.  The SEC Improperly Sought An Ex Parte Temporary Restraining Order ................................................................. 10

    1.  The SEC Made No Showing Of Immediate And Irreparable Injury ......................................................... 11

    2.  The SEC Did Not Establish The Extraordinary Circumstances Necessary to Justify An Ex Parte Proceeding ........................................................................ 12

  B.  This Court Lacks Jurisdiction To Enter and To Enforce The Temporary Restraining Order ............................................. 13

  C.  The SEC Failed To Meet The Standard For A Temporary Restraining Order ................................................................ 15

    1.  The SEC Has Not Made A Prima Facie Showing Of A Violation Of The Securities Laws .................................... 15

    2.  The SEC Did Not Show A Likelihood That Any Alleged Fraud Was Ongoing Or Would Be Repeated .................. 16

    3.  The SEC Has Not Shown A Probability of Success On The Merits ..................................................................... 17

      a.  The SEC Relied on Mr. Aboubakare, and His Testimony Has No Credibility or Evidentiary Value ................................................................... 17

        b.    The SEC Failed To Prove Any Misstatement With Regard To The Use Of Funds ........................................ 17

        c.    The SEC Failed to Show Misappropriation of Assets................................................................................ 18

        d.    The SEC's Actions Were Not Based On Evidence From Of The Allegedly Victimized Taiwanese Banks .......................................................................... 19

        e.    The SEC Failed to Allege or Show That the Alleged Misstatements Regarding Education and Employment Were Material or Made to Investors........ 20

    4.    The SEC Did Not Establish A Possibility of Irreparable Harm .................................................................................... 20

D.    The SEC Failed To Plead Fraud With Particularity .......................... 20

E.    In the Event the Order Is Not Dissolved In Its Entirety, The Court Should Modify the Order To Provide Mr. Pang With A Fair Proceeding ................................................................................ 21

    1.    Mr. Pang Should Be Allowed To Attend To His Business ..... 21

    2.    The Asset Freeze Against Mr. Pang Should Be Modified Substantially ................................................................. 21

    3.    The Court Should Schedule A Hearing To Determine If A Receiver And An Asset Freeze of PEMG Is Truly Necessary ..................................................................... 22

    4.    Paragraphs XIII and XV Allowing the SEC Access to PEMG and Requiring An Accounting Should Be Deleted ..... 24

    5.    Paragraph XVI Regarding Expedited Discovery Should Be Eliminated ................................................................ 25

    6.    Paragraph XVIII Requiring Repatriation of Assets Should Be Deleted ................................................................ 25

    7.    Travel Restriction And Passport........................................... 25

IV.    CONCLUSION ........................................................................... 25

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

## CASES

4

*Basic, Inc. v. Levinson,*
5
    485 U.S. 224 (1988) ...................................................................................... 20

6

*Butte Mining PLC v. Smith,*
    76 F.3d 287 (9th Cir. 1996) ......................................................................... 13

7

*CFTC v. Noble Metals Int'l,*
8
    67 F.3d 766 (9th Cir. 1995) ......................................................................... 22

9

*Feed Management Systems, Inc. v. Brill,*
    No. 06-4126 2006 WL 3247195 (D. Minn. 2006) ........................................ 17

10

*FSLIC v. Sahni,*
11
    868 F.2d 1096 (9th Cir. 1989) ..................................................................... 21

12

*Greenhouse v. MCG Capital Corp.,*
    392 F.3d 650 (4th Cir. 2004) ....................................................................... 20

13

*Grunenthal GmbH v. Hotz,*
14
    712 F.2d 421 (9th Cir. 1983) ................................................................. 13, 15

15

*Hoxworth v. Blinder, Robinson & Co.,*
    903 F.2d 186 (3rd Cir. 1990) ....................................................................... 22

16

*In re Intermagnetics Am.,*
17
    101 B.R. 191 (C.D. Cal. 1989) .............................................................. 12, 13

18

*Insussary v. Adminstaff Cos.,*
    1999 U.S. Dist LEXIS 7154 (S.D.N.Y. 1999) ............................................ 22

19

*MRC Golf, Inc., v. Hippo Golf Company, Inc.,*
20
    No. 09-CV 327-L 2009 U.S. Dist. LEXIS 15625 (S.D. Cal. Feb. 26,
    2009) .......................................................................................................... 12

21

*Reno Air Racing Ass'n, Inc. v. McCord,*
22
    452 F.3d 1126 (9th Cir. 2006) ..................................................................... 12

23

*Royal Air Properties, Inc. v. Smith,*
    312 F.2d 210 (9th Cir. 1962) ....................................................................... 15

24

*Santa Fe Indus., Inc. v. Green,*
25
    430 U.S. 462 (1977) .................................................................................... 18

26

*SEC v. Belmont Reid & Co., Inc.,*
    794 F.2d 1388 (9th Cir. 1986) ..................................................................... 14

27

*SEC v. Credit First Fund, LP,*
28
    No. CV-05-8741, 2006 U.S. Dist. LEXIS 96697 (C.D. Cal. Feb. 13,
    2006) .......................................................................................................... 20

*SEC v. Gonzalez de Castilla*,
   170 F.Supp.2d 427 (S.D.N.Y. 2001) .................................................................21

*SEC v. Grossman*,
   2003 U.S. Dist. Lexis 317 (S.D.N.Y. 2003)......................................................22

*SEC v. Int'l Loan Network, Inc.*,
   770 F. Supp. 678 (D.D.C. 1991) ........................................................................22

*SEC v. Manor Nursing Ctrs., Inc.*,
   458 F.2d 1082 (2d Cir. 1972) .............................................................................24

*SEC v. McMillan*,
   2006 U.S. Dist. LEXIS 89150 (D. Ariz. Dec. 7, 2006)...................................21

*SEC v. Phan*,
   500 F.3d 895 (9th Cir. 2007) .............................................................................15

*SEC v. Spence & Green Chemical Co.*,
   612 F. 2d 896 (5th Cir. 1980)..............................................................22, 23, 24

*SEC v. Unique Fin. Concepts, Inc.*,
   196 F.3d 1195 (11th Cir. 1999) .........................................................................15

*SEC v. United Financial Group, Inc.*,
   474 F.2d 354 (9th Cir. 1973) .............................................................................15

*United States v. Nutri-Cology, Inc.*,
   982 F.2d 394 (9th Cir. 1992) ........................................................................15, 20

*Vess v. Ciba-Geigy Corp.*,
   317 F.3d 1097 (9th Cir. 2003) ...........................................................................20

*White v. Abrams*,
   495 F.2d 724 (9th Cir. 1974) .............................................................................15

**STATUTES**

15 U.S.C. § 77b(a)(1) ...............................................................................................14

15 U.S.C. § 77q(a) ....................................................................................................15

15 U.S.C. § 78c(a)(10)...............................................................................................14

**RULES**

Fed. R. Civ. P. 41(b) ................................................................................................15

**OTHER AUTHORITIES**

Judge Stephen S. Trott, *Words of Warning for Prosecutors Using Criminals as Witnesses*, 47 Hastings L. J. 1381 (1996)......................................................17

# I.   <u>INTRODUCTION</u>

In its zeal to avoid further criticism arising from its failure to identify the Bernard Madoff ponzi scheme, the SEC has created the illusion of an emergency in order to seize an ongoing business and to vilify defendant Danny Pang as the next Bernard Madoff.  In doing so, the SEC has trampled upon the fundamental principles of due process.  The SEC obtained an extraordinarily broad order seizing all of Mr. Pang's assets and his business without notice, without a hearing, and based solely on the hearsay declaration of a disgruntled former employee who had previously sought to shake down Mr. Pang's company.

Fortunately, Mr. Pang now has an opportunity to respond and this Motion will illustrate why the SEC's actions are unfounded.  The SEC failed to inform the Court of the following vital facts which, when considered, illustrate that the SEC has not met their burden to obtain the TRO:

- The SEC's sole witness, the disgruntled former employee, had embezzled $3 million from Mr. Pang's business, had engaged in numerous instances of sexual harassment, and was ultimately fired and sued by PEMG;

- The same employee now runs a business that competes with PEMG, and it is in his financial interest to shut down PEMG;

- The same employee had offered to retract his false allegations if PEMG paid him money;

- PEMG had only raised money from a limited number of Taiwanese banks and had not raised any money since 2008; thus, there was no imminent threat of harm to any entity;

- PEMG had never missed a payment to any bank and has granted requests for over $100 million in redemptions; and,

- PEMG is a going concern overseeing substantial assets, that if held to maturity, could be worth over $1 billion and be

1    sufficient to pay all creditors, plus earn a profit.

2    Mr. Pang is not Bernard Madoff.  He is an individual who deserves the rights that

3    are fundamental to our legal system.  He respectfully submits that this case should

4    be proceeding on a different track, and that Mr. Pang should have a trial before he

5    is judged guilty and punished.

6    There are several reasons why the TRO should be lifted.  First and

7    foremost, the Court and the SEC lack jurisdiction in this matter.  The money raised

8    came entirely from banks in Taiwan, and was provided entirely to British Virgin

9    Island companies.  No money was raised from U.S. investors or U.S. financial

10   institutions.  The SEC has no jurisdiction over wholly foreign transactions that all

11   took place outside the United States.

12   Second, the SEC did not adequately show that an *ex parte* proceeding

13   without notice was necessary.  *Ex parte* proceedings are strongly discouraged

14   because they are so contrary to the fundamental principles of our adversary legal

15   system.  They are justified only if there is a risk of immediate and irreparable

16   harm, and that is clearly not the case here.  PEMG was not actively raising any

17   money from any investor at the time of the SEC's motion, nor was it considering

18   any immediate expenditure of funds.  In fact, the assets at issue are all long term

19   investments, like real estate and a coal mine in China, that cannot be sold or

20   "dissipated" immediately.

21   In addition, the SEC failed to inform the Court that PEMG had taken

22   responsible steps that would have prevented the dissipation of any assets.  Prior to

23   the SEC filing their *ex parte* motion, attorneys for PEMG had pledged their

24   cooperation to the SEC, that the Board of Directors of PEMG had created a Special

25   Committee to investigate the allegations made by the informant, and that the

26   Special Committee had hired a prominent international law firm to conduct an

27   internal investigation into the former employee's allegations, which were first

28   made in the newspapers.  Given such actions, it is clear that there was no

LA\1973402.1

2

Case Number: CV09-2901 PSG (Ex)

1 emergency and certainly no reason for the SEC to litigate in secret *ex parte*.

2     Third, the TRO should be dissolved because the SEC failed to make a
3 threshold showing that PEMG or Mr. Pang had engaged in fraud.  A fraud case
4 requires a showing that the defendant made, with scienter, a material misstatement
5 to an investor that was relied on by the investor in the transaction.  The SEC
6 provided absolutely no real evidence of such a misstatement to any Taiwanese
7 bank.  Instead, it provided hearsay that the former employee said PEMG made
8 misrepresentations to the Taiwanese banks about how their loans to PEMG would
9 be invested.  In truth and fact, the actual documents that were used to raise money
10 from the banks contained no misrepresentations; rather, they contain very broad
11 language that allowed substantial discretion in how the money would be invested.
12 In addition, the documents provided PEMG with substantial fees that could be used
13 however PEMG decided.  The only alleged misstatements identified with any
14 particularity are ones relating to Mr. Pang's biography.  Even if these allegations
15 were true, they are clearly not sufficient to justify a TRO.

16     The SEC has already caused irreparable harm to Mr. Pang's business.
17 The day it obtained its TRO, it issued press releases proudly implying that the SEC
18 had shut down another Bernie Madoff.  The TRO is also causing irreparable harm
19 to Mr. Pang and to PEMG because it is preventing him from managing and operate
20 his business, which is a going concern and not a ponzi scheme.

21     If the Court will not dissolve the TRO in its entirety, then Mr. Pang
22 respectfully requests that the TRO be modified to enable Mr. Pang to defend
23 himself and to allow this case to proceed on a normal track.

24 **II.**  **STATEMENT OF FACTS**

25   A.  PEMG's Business

26     Mr. Pang is one of the founders and is currently the largest
27 shareholder of PEMG.  (*See, e.g.,* Cebeci Decl. Ex. 1 at 13.)  PEMG, a private
28 company, is the parent company of PEMG, LLC, another private company.

PEMG directly or indirectly advises and manages approximately 23 companies incorporated in the British Virgin Islands (collectively, "the BVI Companies"). The BVI Companies borrow money from non-U.S. financial institutions, mostly banks in Taiwan.  Using the borrowed money, and pursuant to individualized written agreements with the non-U.S. financial institutions, PEMG, Inc. invests in various opportunities, including but not limited to timeshare real estate and other properties, debt securities, and "life settlements."  A life settlement is a contract in which a company buys the rights to the benefits of a life insurance policy and agrees to pay the premiums until the insured dies.  For example, a company may buy the rights to a $100,000 insurance policy from an insured for $60,000, and agree to pay the premiums.

The offering documents provide that the Taiwanese banks that lend money to the BVI Companies receive a set "simple annual interest" rate – ranging from 5.25% to 7.00% – for a specified period of time.  The specific terms of the agreement are negotiated with the institutions and are unique to each BVI Company.  (*See, e.g.,* Cebeci Decl. Exs. 2-4).

At the end of the period, the institutions redeem their interests in the BVI Companies and receive their capital back.  PEMG has raised hundreds of million dollars for investment purposes through this process.  Each of the BVI Companies contains monies from one institution and the assets purchased by the BVI Companies are held in custodial accounts.  PEMG has never marketed to any individual or any institution in the United States.

Mr. Pang has been denied access to PEMG's books and records, and therefore is unable to append documents to this motion, including documents that would detail the purchase and maintenance of the hundreds of millions of dollars of assets held in custodial accounts.  Robert Mosier, the court appointed Receiver, has confirmed in conversations with counsel that PEMG has actual assets (unlike a traditional ponzi scheme), including life settlement contracts, real estate, a coal

1   mine, and other interests.  He also indicated that the face value of the life

2   settlement contracts held by the BVI Companies may exceed $1 billion.  That is, if

3   all of the insureds covered in those contracts were to die tomorrow, the BVI

4   entities would receive $1 billion.  Mr. Pang respectfully submits that the

5   investments are adequate to cover the loans from the Taiwanese banks plus a

6   profit.[1]  This will be true, however, only if the business, involving complex assets,

7   is managed competently – something the Receiver is ill-suited to accomplish,

8   despite his considerable expertise.  Indeed, Mr. Pang respectfully submits that the

9   business – and its assets – are being impaired daily because the Receiver has no

10  means of making informed decisions about PEMG's daily operations.

11          Of course, whether or not PEMG is able to pay the Taiwanese banks

12  in full today (based on a forced liquidation of assets in a global recession) is

13  irrelevant to the determination of whether the temporary restraining order is

14  appropriate.  The TRO must be based on a claim of imminent and ongoing fraud,

15  rather than a claim that the investments lost money.

16      B.      SEC Failed To Alert The Court Of  The Language In The Contracts
17              With The Banks

18          The SEC alleged that Mr. Pang defrauded the Taiwanese banks, but it

19  never provided to the Court the agreements with those banks.  The agreements

20  show that PEMG was given broad discretion on how to use the money provided by

21  the banks, and was entitled to substantial fees.

22          Although the relevant agreements between PEMG and the foreign

23  banks contain unique provisions, each contains explicit provisions for the

---

[1]   The Receiver agreed to meet with Mr. Pang's counsel and provided a very general overview of the categories of assets that the Receiver observed upon seizing control of the business.  Among other things, the Receiver confirmed the existence of the categories of assets described above, but made clear that the process of confirming the existence and value of all assets has not been completed.  Mr. Pang's counsel has made several requests to the Receiver for more specific information, but nothing has been provided.

distribution of fees to PEMG, including management fees, transaction fees and the payment of operational expenses.  Even the exhibits appended to the SEC's moving papers, which do not relate to any offering by PEMG, provide for the types of fees described above.[2]  (*See, e.g.,* Cebeci Decl. Ex. 3 at 6-7.)

More importantly, as is common with any private entity which may borrow (or raise) funds from banks, the relevant agreements between PEMG and the foreign banks provided PEMG with wide latitude and discretion on how PEMG used the proceeds.  (*See, e.g.,* Cebeci Decl. Ex. 3 at 4.)

As described in the agreements between the BVI Companies and the foreign banks, the companies advised by PEMG intended to, and did, use a portion of the proceeds they obtained from the foreign banks to purchase, among other things, life settlement contracts.  These contracts were purchased at a considerable discount, with the BVI Companies agreeing to continue servicing the policies for the remaining lifespan of the underlying insured individual.  If the insured individuals died sooner than projected, the BVI Company would enjoy a greater return by virtue of having made fewer premium payments.  Conversely, if the underlying insured individuals outlived the actuarial projections, the BVI Company would enjoy a lesser return by virtue of having made a greater number of premium payments than anticipated.  The BVI Companies also used a portion of its proceeds to purchase real estate, including commercial property and timeshares, and to invest in other assets.  As with any other investment or loan, the value of the BVI Companies' asset portfolio at any given time was subject to fluctuations in the marketplace.  Despite the global recession, none of the BVI Companies had ever missed a payment under any of the agreements with the foreign banks.

---

[2]   The documents attached to Rabia Cebeci's declaration show that Mr. Pang and PEMG have no interest in GVEC.  Rather, a PEMG affiliate served only as advisor to GVEC, for which it received a fee.

C.   The SEC Proceeded Despite The Fact That PEMG Had Agreed to Cooperate

On or about April 15, 2009, the Wall Street Journal reported that Mr. Aboubakare was claiming that PEMG was a Ponzi scheme.  (Cebeci Decl. Ex. 9.)  In response to this article, PEMG took all of the steps one would expect a diligent company to take.  It formed a Special Committee (not including Mr. Pang) of the Board of Directors to investigate the allegations.  It hired Gibson, Dunn & Crutcher, and specifically partners who had previously served as federal prosecutors and SEC Enforcement staff, to investigate the matter.  (Mendel Decl. ¶ 3.)  Mr. Pang resigned from being Chairman of PEMG and had agreed to cooperate.  (Regenstreif Decl. Exs. 1, 8.)  In fact, when the story broke, Mr. Pang was overseas on a long-planned vacation and he voluntarily returned to address the allegations in the newspaper.

In the week prior to when the SEC filed its motion in secret, Mr. Pang's counsel exchanged emails with the SEC's counsel and informed them that Mr. Pang had returned to the country, that he was prepared to cooperate with PEMG's inquiry, and further proposed setting a time to meet with the SEC once Mr. Pang's counsel had an opportunity to consult with his client.  (Regenstreif Decl. Ex. 8.)  Despite this offer, the SEC proceeded *ex parte* and filed its motion.

D.   The SEC's Only Witness Is Completely Lacking In Credibility

The SEC's moving papers are premised entirely upon the allegations of Nasar Aboubakare, a former employee of PEMG, with whom the SEC met only once according to Ms. Cebeci's declaration.  Mr. Aboubakare allegedly told the SEC that: (1) Mr. Pang and PEMG falsely represented that the source of profits to pay returns to "investors" would be generated by certain investments, but was, instead, "a $25 million ponzi scheme"; (2) Mr. Aboubakare had created a bogus insurance policy, allegedly at Mr. Pang's direction, which changed the face amount

7

1    of insurance from approximately $30 million to $100 million[3]; and (3)  PEMG and

2    Mr. Pang had misrepresented Mr. Pang's educational and employment history.

3             Even though the SEC based its motion exclusively on the word of Mr.

4    Aboubakare, the SEC failed to tell the Court that Mr. Aboubakare was a liar, an

5    embezzler, and that he had engaged in multiple instances of improper sexual

6    harassment while employed at PEMG.

7             In or about February, 2007, PEMG discovered that Mr. Aboubakare

8    was engaged in an ongoing scheme by which he and at least one insurance broker

9    conspired to steal from PEMG at least $3 million raised for the purchase of life

10   settlement policies.  (*See* Regenstreif Decl. Ex. 2 at 11:16-25.)  PEMG confronted

11   Mr. Aboubakare with the allegations, he admitted the fraud, and he returned $3

12   million of the embezzled funds.  As a result of the embezzlement, in or about

13   March, 2007, PEMG stripped Mr. Aboubakare of the title of Chief Investment

14   Office and relieved him of virtually all managerial and administrative

15   responsibilities.  (*See* Regenstreif Decl. Ex. 2 at 11:26-12:2.)

16            PEMG executives also discovered that Mr. Aboubakare had been

17   sexually harassing PEMG employees, had engaged in improper conduct with

18   subordinates and outside vendors, and on several occasions used corporate funds to

19   travel with them.  (*See* Regenstreif Decl. Ex. 2 at 10:22-11:5.)  Ultimately, in

20   August 2007, PEMG terminated Mr. Aboubakare and ultimately sued him.  (*See*

21   Regenstreif Decl. Ex. 2 at Ex. 2 at 12:21.)

22            After he was terminated, Mr. Aboubakare became the chief executive

23   officer of a firm involved in the life settlements business and an apparent

24

---

[3]   Notably absent from Mr. Aboubakare's hearsay account is any allegation, or
25    information, detailing what Mr. Aboubakare did with the altered insurance
      policy.  In particular, there is no allegation that the "altered" insurance policy
26    that Mr. Aboubakare created was ever shown to any of the foreign banks or any
      other alleged PEMG investor.  Nor has the SEC presented any evidence from
27    any investor indicating that they were provided with the policy "altered" by Mr.
      Aboubakare.
28

competitor to PEMG.  (Regengstreif Decl. Ex. 3.)  Mr. Aboubakare's allegations against PEMG have certainly aided Mr. Aboubakare's business.  Perhaps most troubling is Mr. Aboubakare's attempt to extract money from PEMG in exchange for retracting the false allegations he had provided to the Wall Street Journal.  The Court was entitled to know about the considerable body of evidence that plainly calls into question Mr. Aboubakare's credibility and his propensity to lie.  Yet, the SEC omitted any mention of these facts from its *ex parte* application.

E.    The SEC Failed to Corroborate Mr. Aboubakare's Claim Regarding The Alleged Ponzi Scheme

Separate and apart from omitting any of the facts concerning Mr. Aboubakare's past, the SEC made no effort to corroborate the most damning of Mr. Aboubakare's allegations: namely, that "in late 2006 or early 2007," Mr. Pang allegedly told Mr. Aboubakare and Robert Anderson, PEMG's current chairman, that PEMG was "a $25 million ponzi scheme."

Despite being aware of the existence of the Special Committee, and its highly regarded outside counsel, the SEC made no attempt to interview Mr. Anderson or otherwise inquire as to whether Mr. Anderson, the only other alleged participant in the conversation, would corroborate this explosive allegation.  Had they done so they would have discovered that Mr. Aboubakare was lying. Immediately after the SEC filed its complaint, Mr. Anderson repeatedly denied that anyone at PEMG, including Mr. Aboubakare or Mr. Pang, had ever suggested that PEMG was a ponzi scheme. (See Mendel declaration ¶ 3.)

The SEC also alleged, based solely on Mr. Aboubakare's uncorroborated claim, that "the investors were provided with this bogus insurance policy in order to induce their investment."  (Pl. Mem. P. & A. 4:20-12.)  While the SEC cites to paragraph nine of Cebici's declaration at this point of its brief, no such information is contained in that paragraph – or any other paragraph – of the declaration.  There is no credible evidence at all that any forged insurance policy

was provided to any of the foreign banks.  Indeed, the Taiwanese bank that made the loan for the purchase of the time share real estate at issue, had never seen the insurance policy that Mr. Aboubakare claims he altered and the SEC claims was provided to investors.  (*See* Regenstreif Decl. Ex. 7.)

F.   The SEC Has Provided Absolutely No Financial Evidence Regarding PEMG

Perhaps most troubling regarding the SEC's action is the complete absence of any evidence to support the SEC's claim that PEMG is currently operating a ponzi scheme.  Indeed, the SEC's allegations are old and stale.  In its moving papers, the SEC quotes Mr. Aboubakare as saying that "Mr. Pang conducted the [$25 million] ponzi scheme in 2006 and 2007."  (Cebeci Decl. at ¶ 8.)  Totally absent is any evidence to support the implicit suggestion that PEMG is currently operating a ponzi scheme, i.e., raising new investor funds to pay old investors.  The SEC has provided no explanation why it needed to seize almost $1 billion in assets to address an alleged $25 million ponzi scheme.

III.   **ARGUMENT**

A.   The SEC Improperly Sought An *Ex Parte* Temporary Restraining Order

The SEC's request for the *ex parte* issuing of a temporary restraining order was unwarranted.  In filing its application *ex parte*, the SEC put the Court in a difficult position.  The SEC gave the Court the impression that there was a high profile emergency that required extraordinary action to protect investors.  In fact, there was no basis at all for the SEC to proceed *ex parte*.

Federal Rule of Civil Procedure 65 allows for the issuance of a temporary restraining order without written or oral notice to the adverse party or its attorney in only one limited circumstance.  Such an order may be issued "**only if** specific facts in an affidavit or a verified complaint **clearly show that immediate and irreparable** injury, loss, or damage will result to the movant before the

1  adverse party can be heard in opposition, and the movant's attorney **certifies in**
2  **writing any efforts made to give notice and the reasons why it should not be**
3  **required**."  Fed. R. Civ. Proc. 65(b)(1) (emphasis added).

4         1.  *The SEC Made No Showing Of Immediate And Irreparable*
5            *Injury*

6        The SEC offered no specific facts – or even any facts – in an affidavit
7  nor in a verified complaint that *clearly show* immediate and irreparable injury,
8  loss, or damage, as required by the Federal Rules.  The SEC simply stated, in
9  conclusory fashion, that *ex parte* proceedings were appropriate because "the
10  Defendants have been operating a ponzi scheme, are currently holding investor
11  funds, and own assets purchased with investor funds."  (Pl.'s *Ex Parte* Application
12  2:20-21.)

13        The SEC presented no evidence demonstrating that PEMG was
14  dissipating assets – on the contrary the assets at issue are illiquid and cannot be
15  sold quickly.  The SEC presented no evidence that PEMG was actively raising
16  money from anyone.  The SEC presented no evidence demonstrating that any bank
17  or investor had complained.  The only evidence presented to seize an ongoing
18  business and the entirety of Mr. Pang's estate is the uncorroborated, unverified,
19  antiquated, and clearly false hearsay allegations of a former employee, who stole
20  money, sought to blackmail the Company and then set up a competing firm.

21        The facts known to the SEC before it filed this motion also
22  demonstrate a complete absence of any need to proceed in secret.  The SEC knew
23  from Mr. Pang's counsel that Mr. Pang had returned to the U.S. five days
24  previously and was prepared to address Mr. Aboubakare's allegations as reported
25  in the newspapers.  Yet, without even the slightest showing – indeed not a single
26  shred of evidence – the SEC proceeded to this Court without notice to counsel,
27  implied to the Court that Mr. Pang was a flight risk, and requested that the Court
28  take the extraordinary step of seizing Mr. Pang's passport.  The moving papers are

1   simply devoid of any evidence or any citation to support that requested relief.

2          The SEC alternatively tried to justify its *ex parte* proceedings by

3   stating, with no supporting evidence, that "[p]rior notice of [the SEC's] action and

4   requested relief would give Defendants **an opportunity** to further dissipate assets."

5   (Pl.'s Mem. P. & A. 2:15-17 (emphasis added).)  Yet Rule 65 requires the SEC to

6   show when moving for a TRO without Defendants' notice that giving notice "**will**

7   **result**" in immediate and irreparable damage – not that there is merely an

8   opportunity for assets to be moved or sold.  Under the SEC's reasoning, every case

9   they file would warrant *ex parte* proceedings because there will always be "an

10  opportunity" for assets to be sold or moved before a case is concluded.

11          2.    *The SEC Did Not Establish The Extraordinary Circumstances*
12                *Necessary to Justify An Ex Parte Proceeding*

13          "Circumstances justifying the issuance of an *ex parte* temporary

14  restraining order are extremely limited because 'our entire jurisprudence runs

15  counter to the notion of court action taken before reasonable notice and an

16  opportunity to be heard has been granted to both sides of a dispute.'"  *MRC Golf,*

17  *Inc., v. Hippo Golf Company, Inc.*, No. 09-CV 327-L 2009 U.S. Dist. LEXIS

18  15625, at *7 (S.D. Cal. Feb. 26, 2009) (quoting *Reno Air Racing Ass'n, Inc. v.*

19  *McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006) (citations omitted).  "Where it is

20  possible to find and serve the adverse party, courts have recognized 'a very narrow

21  band of cases in which *ex parte* orders are proper because notice to the defendant

22  would render fruitless the further prosecution of the action.'"  *Id.* at * 8 (quoting

23  *Reno Air Racing*, 452 F.3d at 1131).

24          The courts have cautioned strongly against the use of *ex parte*

25  applications.  Then-District Judge Rymer noted that "*ex parte* proceedings pose a

26  threat to the adversary system," and thus a threat to "accuracy, fairness, and

27  consistency."  *In re Intermagnetics Am.*, 101 B.R. 191 (C.D. Cal. 1989).  *Ex parte*

28  applications "contravene the structure and spirit of the Federal Rules of Civil

Procedure and the local rules of [the Central District]," both of which contemplate noticed motions should be the rule rather than the exception.  *Id.*  They impose "an unnecessary administrative burden on the court and an unnecessary adversarial burden on opposing counsel who are required to make a hurried response under pressure, usually for no good reason."  *Id.*  They "put the applicant 'ahead of the pack,' without cause or justification."  *Id.*

This is precisely what has occurred here.  Mr. Pang already lost this case before he ever had notice of the allegations.  His business and all of his personal assets are taken, and the SEC even wants to prevent him from using his money to hire a lawyer.  (Regenstreif Decl. Exs. 4-6.)  Because the SEC failed to justify its *ex parte* action, the TRO should be dissolved and the case should proceed on a different track.

B.     This Court Lacks Jurisdiction To Enter and To Enforce The Temporary Restraining Order

The SEC failed to provide sufficient allegations to establish that the Court has jurisdiction to hear this case or to issue the temporary restraining order. A court has jurisdiction over securities cases only when there is conduct or effects within the United States.  *Grunenthal GmbH v. Hotz*, 712 F.2d 421 (9th Cir. 1983). Here, PEMG advised British Virgin Island companies that raised money from Taiwanese banks.  The SEC has not identified any U.S. investor that was harmed by the transactions with the Taiwanese banks.  As a result, there are no "effects" in the United States as a result of the alleged conduct.

There is also no "conduct" within the United States that could give rise to jurisdiction.  Conduct is sufficient to create jurisdiction only if it is significant with respect to the alleged violation, it involves interstate commerce, and it furthers the fraudulent scheme.  *Id.* at 424-25.  There is no allegation that PEMG or Mr. Pang negotiated any agreements in the United States.

The mere fact that plaintiffs allege that defendants engaged in certain

1  acts in the United States is by no means sufficient to confer subject matter

2  jurisdiction.   For example, in *Butte Mining PLC v. Smith*, 76 F.3d 287 (9th Cir.

3  1996), plaintiffs described at least four acts by defendants that took place in the

4  U.S., but the court found that there was no subject matter jurisdiction because,

5  among other reasons, the conduct in the U.S. was "merely preparatory."  That

6  conduct included the purchase of land in the U.S., the formation of corporations

7  and shell companies in the U.S., payments made in the U.S., and communications

8  using systems in the U.S.

9          Similarly, in obtaining the temporary restraining order here, the SEC

10 alleged that PEMG is organized under Nevada law and located in Irvine, and that

11 some of the investments made by PEMG involved U.S.-based property.  These

12 allegations do not begin to show that this Court or the SEC has subject matter

13 jurisdiction.

14         In the end, this is a case about British Virgin Island companies

15 allegedly defrauding Taiwanese banks (none of whom complained to the SEC).

16 Indeed, in some instances, PEMG's only role was to provide investment advice to

17 Taiwanese investment managers who obtained money from Taiwanese banks.

18 The SEC does not have jurisdiction to bring such an action, and therefore the Court

19 does not have jurisdiction to determine this dispute.

20         There is also a substantial question whether any of the transactions

21 between the British Virgin Island Companies and the Taiwanese banks involved

22 "securities" as defined in the statute.  15 U.S.C. § 77b(a)(1); 15 U.S.C. §

23 78c(a)(10).  If these loans are not securities as defined in the statute, then the Court

24 and the SEC would have no jurisdiction to proceed.  *See, e.g., SEC v. Belmont Reid*

25 *& Co., Inc.*, 794 F.2d 1388 (9th Cir. 1986) (affirming district court's grant of

26 summary judgment upon a finding that the instruments at issue were not securities

27 as defined by the Securities Act and Securities Exchange Act).

28

C.    The SEC Failed To Meet The Standard For A Temporary Restraining Order

In order to obtain a temporary restraining order, the SEC must establish:  (a) a *prima facie* case that a violation of the securities laws has occurred, (b) a reasonable likelihood that the violation will be repeated, and (c) a "probability of success" on the merits and a possibility of irreparable injury.  *See* Pl.'s Mem. of P. & A.  at 5-6, citing *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 n.2 (11th Cir. 1999); *SEC v. United Financial Group, Inc.*, 474 F.2d 354, 358-359 (9th Cir. 1973).  *See also United States v. Nutri-Cology, Inc.*, 982 F.2d 394, 398 (9th Cir. 1992).[4]   The SEC has not met any of these standards.

1.    *The SEC Has Not Made A Prima Facie Showing Of A Violation Of The Securities Laws*

To make out a *prima facie* case for its claims under Section 17(a) and Section 10(b) and Rule 10b-5, the SEC must prove: (1) a material misstatement or omission (2) in connection with the offer or sale (or purchase or sale) of a security (3) by means of interstate commerce.  *See SEC v. Phan*, 500 F.3d 895, 907-08 (9th Cir. 2007); *White v. Abrams*, 495 F.2d 724, 729 (9th Cir. 1974) (quoting *Royal Air Properties, Inc. v. Smith*, 312 F.2d 210, 212 (9th Cir. 1962)); 15 U.S.C. § 77q(a); *Grunenthal GmbH v. Hotz*, 712 F.2d 421 (9th Cir. 1983).  The evidence must be sufficient "to get a plaintiff past a motion for a directed verdict in a jury case or

---

[4]   According to the 9th Circuit in *Nutri-Cology*, "[g]enerally, to obtain a preliminary injunction, the moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips in its favor. . . . These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. . . . In statutory enforcement cases where the government has met the 'probability of success' prong of the preliminary injunction test, we presume it has met the 'possibility of irreparable injury' prong because the passage of the statute is itself an implied finding by Congress that violations will harm the public." *Nutri-Cology, Inc.*, 982 F.2d at 398 (internal citations and some quotation marks omitted).  Thus, if the government fails to "show that it would probably prevail on the merits," it is "not entitled to a presumption of irreparable injury." *Id.*

1  motion to dismiss pursuant to Fed. R. Civ. P. 41(b) in a nonjury case.  It is the

2  evidence necessary to require a defendant to proceed with his case." *White v.*

3  *Abrams*, 495 F.2d at 729.

4        The SEC has not met this standard.  It has not identified any material

5  misstatement with any particularity.  Its only allegation is that Mr. Aboubakare

6  said that at an unspecified time Mr. Pang made misrepresentations to unspecified

7  Taiwanese banks about how the money they provided to BVI entities advised by

8  PEMG would be invested.  The SEC has not even met the standard to *plead* fraud,

9  much less the standard to show a *prima facie* case.

10        There is no evidence that any misrepresentation was made at the time

11  of any transaction between the BVI entities and any of the Taiwanese banks.

12  Finally, there is no evidence that any misrepresentation was made in the United

13  States, much less through interstate commerce.

14        2.   *The SEC Did Not Show A Likelihood That Any Alleged Fraud*

15             *Was Ongoing Or Would Be Repeated*

16        It is undisputed that PEMG was not raising any money at the time the

17  SEC filed its *ex parte* motion.  None of the Taiwanese banks were imminently

18  going to make more loans.  PEMG had not raised money since 2008.

19        The SEC submitted to the Court newspaper articles about Mr.

20  Aboubakare's allegations, and even attached them as evidence in support of their

21  motion.  (Cebeci Decl. Exs. 9-11.)  We are not aware of any case law that suggests

22  a newspaper article is sufficient evidence to support a temporary restraining order.

23  Unfortunately, the SEC did not tell the Court that PEMG took responsible steps in

24  response to these articles, such as by hiring counsel and initiating an investigation.

25

26

27

28

3.   *The SEC Has Not Shown A Probability of Success On The Merits*

a.     *The SEC Relied on Mr. Aboubakare, and His Testimony Has No Credibility or Evidentiary Value*

The SEC relied almost exclusively on Mr. Aboubakare's uncorroborated hearsay statements in alleging that Mr. Pang and PEMG made misrepresentations of material fact.  There clearly is no probability of success on the merits when the entire case is based on the hearsay statement of one witness. *Cf. Feed Management Systems, Inc. v. Brill*, No. 06-4126 2006 WL 3247195 (D. Minn. 2006) (finding no probability of success on the merits in breach of contract case where among other issues the only evidence presented of customer confusion was hearsay statements from single affiant).

Mr. Aboubakare is not, however, just an ordinary witness.  He is an informant who committed a major crime by embezzling over $3 million and who offered to retract his false allegations for money.  Courts have for decades warned of the dangers of relying on informants.  For example, Ninth Circuit Judge Trott, a former federal prosecutor, has in multiple opinions and articles warned government attorneys about the dangers of relying on individuals like Mr. Aboubakare:

> Mistrust everything [the witness] says.  Be actively suspicious.  Look for corroboration on everything you can; follow up on all indications that he may be fudging . . . Assess the motivation of the witness.

Judge Stephen S. Trott, *Words of Warning for Prosecutors Using Criminals as Witnesses*, 47 Hastings L. J. 1381, 1406 (1996).  The SEC did absolutely none of this basic work that any government enforcement lawyer should do when dealing with a criminal informant.

b.     *The SEC Failed To Prove Any Misstatement With Regard To The Use Of Funds*

The SEC failed to prove any misstatement regarding the use of funds raised from the Taiwanese banks.  The SEC, quoting Mr. Aboubakare, alleges that

PEMG lied to the Taiwanese banks about how funds raised would be invested by telling them that funds would be used to buy timeshare properties when in fact the funds were used to pay obligations on life insurance contracts.  Unfortunately, the SEC did not provide the specific documents that contained the specific misrepresentations, and on this basis alone they have failed to meet their burden of showing a probability of success on the merits.

The actual documents used to raise money from the banks, only a few of which have been made available, make clear that there were no such lies.  The loan agreements used with the banks contain very broad language that allows the BVI Companies advised by PEMG broad discretion in how to use the funds.  For example, one document states that the funds raised can be used for:

> (i) [R]eal estate and real estate contracts; (ii) diverse portfolio of privately held business assets…(iii) securities issued by technology-related and other companies, private and public…(iv) asset-backed funding to qualified companies in various industries; (v) other opportunities Manager believes represent growth and profit.

Cebeci Decl., Ex. 3, at 4.  When the court looks at the actual evidence, rather than the hearsay of the embezzler, it will see that the SEC failed to meet its burden.

c.   *The SEC Failed to Show Misappropriation of Assets*

The SEC provided no evidence that any expenditure by PEMG or Mr. Pang was improper.  PEMG and Mr. Pang, like any investment advisor, were entitled to substantial fees, including (a) management fees of approximately 1.5% of all assets; (b) start and organizational fees ranging between .75% and 1.25% of the total amount raised; and (c) transaction, consulting and management fees from the BVI entities.  PEMG rightfully earned tens of millions of dollars which it was free to use as it deemed fit.  The owners of PEMG also contributed their own capital to the business, which again they were entitled to spend however they wish.

The SEC provided no evidence that any expenditure was illegal or even violated a fiduciary duty.  The SEC failed to articulate to whom, if anyone,

PEMG owed a fiduciary duty – to the shareholders of PEMG (the largest of whom is Mr. Pang), to the BVI Companies, or to the Taiwanese banks.  Even if there were a breach of fiduciary duty, that is not sufficient to justify a restraining order.  The SEC was required to show – but did not – that Danny Pang intentionally or recklessly deceived an investor.  *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977) (alleging breaches of corporate fiduciary duty fails to state claim under Section 10(b) or Rule 10b-5).

d.   *The SEC's Actions Were Not Based On Evidence From The Allegedly Victimized Taiwanese Banks*

There is no evidence to suggest that the SEC spoke with any of the Taiwanese banks that were allegedly the victims of the fraud before it sought the order.  Mr. Aboubakare had already generated substantial publicity by reporting his allegations to the press weeks before the SEC filed its motion, yet none of the Taiwanese banks had brought a lawsuit.  Instead, the Taiwanese banks were meeting with PEMG to hear their response to the allegations before taking action.  The approach of the alleged victims who had invested hundreds of millions of dollars is in marked contrast to the SEC's approach.

Ironically, the SEC's acts have actually harmed the Taiwanese banks and they threaten to do more immediate harm because the Receiver is not qualified to run PEMG's business.  The SEC has banned Mr. Pang from continuing to run the business or negotiate with the Taiwanese banks.   The SEC also induced the Court to enter an order requiring Mr. Pang to repatriate assets from Taiwan or China to the United States, yet all of the alleged victim banks are in Taiwan.  In addition, the SEC has barred the Taiwanese banks from bringing their own lawsuits, and has now forced the Taiwanese banks to obtain redress for any alleged fraud through the SEC's action in the United States courts, rather than in the forum of their choice with the lawyers of their choice.  This is an unprecedented exercise of extra-territorial jurisdiction that serves no valid interests in the United States.

19

e.   *The SEC Failed to Allege or Show That The Alleged Misstatements Regarding Education and Employment Were Material or Made to Investors*

The SEC also failed to identify that any investor read or received a misstatement regarding Mr. Pang's education or background, and failed to show that any such statements were *material.*  A fact is material if there is "a substantial likelihood that the disclosure of the . . . fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. "  *Basic, Inc. v. Levinson*, 485 U.S. 224, 238 (1988).  Without any evidence regarding the impact these alleged misstatements had on the Taiwanese banks, the SEC has not shown that these statements are material.  *Cf. Greenhouse v. MCG Capital Corp.*, 392 F.3d 650 (4th Cir. 2004) (misrepresentation of chief executive officer's educational background held immaterial as matter of law).

4.   *The SEC Did Not Establish A Possibility of Irreparable Harm*

If the SEC is only able to make a "colorable evidentiary showing" of a violation, then it needs to make a showing of irreparable harm before it can obtain emergency injunctive relief.  *See Nutri-Cology*, 982 F.2d at 398; *SEC v. Credit First Fund, LP*, No. CV-05-8741, 2006 U.S. Dist. LEXIS 96697, at *6-7 (C.D. Cal. Feb. 13, 2006) (applying heightened requirement in *Nutri-Cology* to SEC enforcement actions).  For the reasons articulated above, the SEC has failed to do so, and it is clear that the issues in this case can be litigated in the normal course.

D.   The SEC Failed To Plead Fraud With Particularity

The SEC was required to plead fraud with particularity pursuant to Federal Rule of Civil Procedure 9(b).  Rule 9(b) required the SEC to allege the "who, what, where, when, and how" of the fraudulent conduct. *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1106 (9th Cir. 2003).  The SEC's Complaint falls well short of this requirement.  The SEC's motion (and complaint) does not identify:  (a) which bank was defrauded, (b) which document given to the bank, if any,

contained a misrepresentation, (c) the alleged misstatement, (d) why the alleged misstatement was false, and (e) whether the bank relied on the misstatement. The SEC essentially argues that Nasar Aboubakare says it's true, so it must be true. This is not remotely close to what is required to be alleged in fraud cases. *Id.*

E.   In the Event the Order Is Not Dissolved In Its Entirety, The Court Should Modify the Order Substantially

In the event the Court is reluctant to dissolve the order in its entirety, we ask for at the very least the following relief which is fundamental to Mr. Pang's right to due process.

1.   *Mr. Pang Should Be Allowed To Attend To His Business*

The SEC's order prohibits Mr. Pang from obtaining access to his documents and his business. As we write this motion, the SEC is meeting secretly with the Receiver and PEMG's employees and Mr. Pang and his counsel are completely excluded from this process. This is not how litigation should work, and Mr. Pang should have access to his business and documents to defend himself.

2.   *The Asset Freeze Against Mr. Pang Should Be Modified Substantially*

Paragraphs IV and V of the Order imposes an asset freeze on all of PEMG's, PEMG LLC's, and Mr. Pang's assets, which we submit is overbroad. Mr. Aboubakare's uncorroborated claims alleged only a $25 million "ponzi scheme," yet assets far in excess of that have been seized from the business and *all* of Mr. Pang's assets have been frozen. Mr. Pang requests that Paragraphs IV and V of the order be lifted in their entirety.

Courts have discretion to modify asset freezes. *SEC v. McMillan*, No. CV-06-0951 2006 U.S. Dist. LEXIS 89150, at *1-2 (D. Ariz. Dec. 7, 2006). In *FSLIC v. Sahni*, 868 F.2d 1096, 1097 (9th Cir. 1989), the Ninth Circuit held that "the proper standard for the district court to apply in deciding whether to issue a freeze is whether [the government] has shown a likelihood of success on the merits

1   and a possibility of dissipation." *Sahni*, 868 F.2d at 1097. As discussed above, the

2   SEC has not shown either a possibility of success on the merits or of dissipation.

3       If the Court will not remove the freeze in its entirety, it should modify

4   it substantially. The primary purpose of an asset freeze is to facilitate

5   compensation of allegedly defrauded investors in the event a violation is

6   established at trial. *SEC v. Gonzalez de Castilla*, 170 F.Supp.2d 427, 429

7   (S.D.N.Y. 2001); *SEC v. Lauer*, 445 F. Supp. 2d 1362, 1367 (S.D. Fla. 2006)

8   (amount of assets frozen should reasonably approximate the potential

9   disgorgement); *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 198 (3rd Cir.

10  1990) (unfreezing assets because of the overly broad scope of the freeze). Here,

11  the SEC has provided the Court with no estimation of an expected judgment, and

12  instead simply requested that all the assets be frozen or repatriated. (Pl.'s Mem. P.

13  & A. 14:2-13.) This is overbroad.

14      The freeze should be reduced substantially, and should allow at the

15  very least Mr. Pang to access assets to pay for counsel. A district court has broad

16  discretion with respect to permitting a defendant to use frozen assets to pay

17  attorneys' fees. *See CFTC v. Noble Metals Int'l*, 67 F.3d 766, 775 (9th Cir. 1995)

18  (court may allow frozen assets to be used for attorney's fees); *SEC v. Grossman*,

19  No. 87 Civ. 1031 2003 U.S. Dist. LEXIS 317, at *16 (S.D.N.Y. 2003) (asset freeze

20  was modified to permit payment of attorneys' fees); *SEC v. Int'l Loan Network,

21  Inc.*, 770 F. Supp. 678, 680 (D.D.C. 1991) (modifying freeze to permit defendants

22  to retain counsel). Mr. Pang has a valid, complicated defense that requires counsel.

23  Accordingly, Mr. Pang is entitled to access his money to fund his legal defense.

24          3.   *The Court Should Schedule A Hearing To Determine If A
                 Receiver And An Asset Freeze of PEMG Is Truly Necessary*
25

26      It is clear that the SEC lacked a sufficient basis for appointing a

27  Receiver or freezing PEMG's assets. The imposition of a receivership on a

28  corporation is a drastic measure, and the detrimental business effects should be

1   carefully considered. *SEC v. Spence & Green Chemical Co.*, 612 F. 2d 896, 904

2   (5th Cir. 1980). The SEC did not engage in any such balancing. In *Insussary v.*

3   *Adminstaff Cos.*, No. 98-Civ. 5404 1999 U.S. Dist. LEXIS 7154, at *8 (S.D.N.Y.

4   1999), the court found that plaintiffs failed to sustain the high burden required for

5   the appointment of a receiver because they did not demonstrate that there was a

6   genuine emergency that defendants would squander assets, or that any fraudulent

7   activities were occurring at the defendant company that required the

8   "extraordinary" remedy of a receiver. *Insussary v. Adminstaff Cos.*, 1999 U.S.

9   Dist. LEXIS 7154at *8.

10          The same is true here. There was no emergency at PEMG. PEMG

11   manages assets worth approximately $1 billion. The allegations of fraud are

12   untrue. There is no evidence that anyone is squandering assets. The SEC argued

13   that the appointment of a receiver was necessary "to ensure that the distribution of

14   investor funds is done equitably, orderly and promptly." (Pl.'s Mem. P. & A.

15   14:24-25.) This was absolutely not true. The money in the BVI Funds need not

16   be "distributed" at all; in fact, it may be in the best interests of the foreign banks

17   and the owners of PEMG (including Mr. Pang) to hold the current assets to

18   maturity. Someone needs to make an investment decision regarding these assets.

19   That investment decision should have been made by the people with a vested

20   interest in the business – i.e., Mr. Pang and the Taiwanese banks, who were

21   discussing the action before the SEC moved unilaterally. This important decision

22   should not be made by a Receiver that is unfamiliar with the business or by the

23   SEC that has clearly illustrated a lack of judgment and objectivity.

24          Unfortunately it is too late to undo the damage done by the SEC. At

25   this point, the Receiver has been working at the business for over a week, has

26   changed all of the locks, has diverted the email, and is attempting to run a business

27   with which he is totally unfamiliar. All of PEMG's companies and lenders are

28   well aware of the Receiver as a result of the SEC's media campaign.

Mr. Pang has no real idea what the Receiver has done with Mr. Pang's business.  Mr. Pang is entitled to an opportunity to meet with the Receiver to determine what has occurred at the business, and to determine how best the business should be managed going forward.  It is also clear that the Court has the power to terminate the Receiver or modify his appointment accordingly.

The Court in *Spence & Green Chemical Co.* cautioned that a receivership should be terminated and control returned to those who own the business as soon as the reason for its imposition ceases.  *Spence & Green Chemical Co.*, 612 F. 2d at 904.  Mr. Pang therefore requests that, if the Court is unwilling to dissolve the TRO in its entirety, that the Order be modified to require the Receiver to meet with counsel for Mr. Pang and to provide ongoing reports to Mr. Pang.  We also request that the Court hold a hearing within two weeks to determine whether the Receiver should remain in place.  PEMG needs experienced people familiar with these sophisticated investments to manage the business, and there is concern that the Receiver, while skilled at liquidations and distributions, may not have the skills to operate a sophisticated investment management company.

The asset freeze on PEMG should also be reconsidered.  In some circumstances, maintaining a freeze might thwart the goal of compensating investors if the freeze were to cause such disruption of a defendant's business affairs that the defendant would be financially destroyed.  *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972).  Therefore, the disadvantages and possible deleterious effects of a freeze must be weighed against the considerations in favor of a freeze.  *Id.*  The SEC did not engage in any such balancing act.

4.   *Paragraphs XIII and XV Allowing the SEC Access to PEMG and Requiring An Accounting Should Be Deleted*

The Order allows the SEC to have continuing access to PEMG (paragraph XIII) and requires Mr. Pang to submit an accounting to the SEC (paragraph XV).  These requirements should be eliminated.  After having misled

and submitted incomplete information to the Court, the SEC should not be able to have unfettered access to Mr. Pang's business, nor should it be allowed to create ad hoc procedures not called for in the local Rules.

        5.   *Paragraph XVI Regarding Expedited Discovery Should Be Eliminated*

The Order allows the SEC to obtain the tactical advantage of expedited discovery against Mr. Pang, who has his hands tied behind his back because of the asset freeze and the lack of access to any witnesses or documents. Discovery should proceed in the normal course of litigation.

        6.   *Paragraph XVII Requiring Repatriation of Assets Should Be Deleted*

Paragraph XVII, requiring PEMG and Mr. Pang to repatriate all of their assets in any foreign locations to the Court, should be deleted in its entirety.

        7.   *Travel Restriction And Passport*

There has been no showing whatsoever that Mr. Pang is a flight risk. Therefore, Mr. Pang's passport should be returned.

## IV.   <u>CONCLUSION</u>

The SEC has punished Mr. Pang without a trial and without even allowing him to spend his own money to hire a lawyer, based solely on hearsay from an inherently unreliable embezzler.  Mr. Pang respectfully submits that the temporary restraining order should be dissolved, and Mr. Pang should be afforded the rights that are inherent to our legal system.

Dated:  May 5, 2009

                           LATHAM & WATKINS LLP

                           By /s/ David J. Schindler
                              Attorneys for Defendant
                              Danny Pang