**O**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**1**

## CIVIL MINUTES - GENERAL

| Case No. | CV 09-2901 PSG (Ex) | Date | July 2, 2009 |
|---|---|---|---|
| Title | Securities and Exchange Commission v. Private Equity Management Group, Inc. | | |

| Present: | The Honorable Philip S. Gutierrez, United States District Judge |
|---|---|

| Wendy K. Hernandez | Not Present | n/a |
|---|---|---|
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiff(s): | Attorneys Present for Defendant(s): |
|---|---|
| Not Present | Not Present |

**Proceedings:**   **(In Chambers) Order Granting Securities and Exchange Commission's Application for Preliminary Injunction**

Pending before the Court is Security and Exchange Commission's Application for Preliminary Injunction. The Court heard oral argument on this matter on June 29, 2009. After considering the moving and opposing papers, as well as all oral argument, the Court GRANTS the Application for Preliminary Injunction.

I.   Background

A.   Procedural Background

On April 24, 2009, plaintiff Securities and Exchange Commission (the "SEC") filed a complaint for violations of the federal securities laws against defendants Danny Pang ("Pang"), Private Equity Management Group, LLC ("PEMG"), and Private Equity Management Group, Inc. ("PEMG, Inc.") (collectively, "Defendants").[1] That same day, the SEC applied ex parte, pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, for a Temporary Restraining Order prohibiting Defendants from committing violations of the antifraud provisions of the federal securities laws, and for orders freezing assets, appointing a temporary receiver over the entity defendants, repatriating assets, requiring accountings, prohibiting the destruction of documents, granting expedited discovery, and surrendering the passport of Pang. In addition, the SEC applied for an order to show cause re preliminary injunction and appointment of a permanent receiver.

---

[1] For ease of presentation, the Court will refer to the entity defendants as "PEMGroup."

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

1

## CIVIL MINUTES - GENERAL

| Case No. | CV 09-2901 PSG (Ex) | Date | July 2, 2009 |
|---|---|---|---|
| Title | Securities and Exchange Commission v. Private Equity Management Group, Inc. | | |

On April 27, 2009, the Court granted the SEC's ex parte application and ordered the parties in this case to appear before the Court on May 11, 2009 to show cause why a preliminary injunction should not be granted and a permanent receiver not appointed. Then, on May 8, 2009, the Court reset the present motion for hearing for June 15, 2009. Subsequently, the parties submitted a joint request to move that hearing date from June 15, 2009 to June 29, 2009. Oral argument was then held on this matter on June 29, 2009.

B.      Factual Background

        1.      The Cast of Characters

Pang is the president and one of the directors of PEMG, Inc. *Cebeci Supp. Decl.* ¶ 3. He is also PEMG, Inc.'s largest shareholder. *Opp.* 2:26-27.

PEMG, Inc. is the parent company of PEMG. *Id.* at 2:28. Both entity defendants are private United States companies. *Id.* at 2:27-3:1.

Wilbur B. Quon ("Quon") is a certified public accountant who is presently employed by PEMG, Inc. *Quon Decl.* ¶ 2. He became the Chief Financial Officer of PEMG, Inc. on October 8, 2004, but later resigned from that position at the request of the law firm of Gibson, Dunn & Crutcher ("Gibson, Dunn"). *Id.* He is also currently a 6% partner in PEMG, Inc. and has served as a member of PEMG, Inc.'s Board of Directors since 2004. *Id.*

Nasar Aboubakare ("Aboubakare") was managing director of PEMG, Inc. from 2002 through 2005. *Aboubakare Decl.* ¶ 3. He also served as the Chief Investment Officer from 2005 through August 2007, and as the President of PEMG, Inc. from 2006 through August 2007, at which time he was terminated. *Id.*

Bob Anderson ("Anderson") is currently the interim Chairman of PEMG, Inc. *Anderson Decl.* ¶ 1. Prior to being appointed to that position, he had been the Chief Operations Officer of PEMG, Inc., holding that position for roughly two years. *Id.*

Sheryl Perez ("Perez") is the Assistant Vice President and Controller of PEMGroup. *Perez Decl.* ¶ 2. She has been working for PEMGroup since November 1, 2006. *Id.*

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

1

## CIVIL MINUTES - GENERAL

| Case No. | CV 09-2901 PSG (Ex) | Date | July 2, 2009 |
|---|---|---|---|
| Title | Securities and Exchange Commission v. Private Equity Management Group, Inc. | | |

Bank Sinopac, Hong Kong Branch ("Bank Sinopac") is one of the investors in this case. Bank Sinopac made four investments totaling $177 million with PEMGroup and/or related entities between February 2004 and October 2006. *Kao Decl.* ¶ 3.

Standard Chartered Bank Taiwan Ltd. ("Standard") is another one of the investors in this case. In 2006, Standard, as trustee acting on behalf of certain customers, subscribed to a total of $255 million in Notes issued by a company that the SEC contends is affiliated with Defendants. *Hsin-Tung Decl.* ¶ 2.

> 2. The Offerings at Issue

> a. General Overview

Beginning in at least 2004, six entities incorporated in the British Virgin Islands ("BVI") conducted a series of offerings through Confidential Private Offering Memoranda ("CPOM"). *Opp.* at 3. These entities were as follows: Genesis Voyager Equity Corporation ("GVEC"), Genesis Voyager Equity II Corporation ("GVEC II"), GVEC Resource ("GVECR"), Genesis Voyager Resource II ("GVECR II"), GVEC Resource III ("GVECR III"), and GVEC Resource IV ("GVECR IV").[2] *Opp.* at 3; *cf. Quon Decl.* ¶ 3; *Aboubakare Decl.* ¶ 4. The CPOMs describe the relationship between the investor and the particular BVI entity. *Opp.* at 3.

The CPOMs were issued to an investor group that consists of eight banks/financial houses and approximately thirty-six high net individuals plus six companies. *Receiver's Second Status Report* ("*SSR*") at 2:10-12. The investors have a current outstanding balance of $823 million plus approximately $4 million in accrued interest for May 2009. *Id.* at 2:13-14. Each investor owns investments in thirty tranches that in turn own discrete assets and life settlement policies creating a pool of investments. *Id.* at 2:16-18.

> b. Bank Sinopac's Investments

---

[2] The SEC characterizes the BVI entities as special purpose vehicles ("SPV") of PEMGroup, i.e., companies created by PEMGroup for a limited purpose or focus. Often, though not always, a SPV is owned almost entirely by the sponsoring company. It is Defendants' position, however, that these BVI entities are not owned by PEMGroup, but are instead owned by various foreign entities or individuals. However, as is shown below, there is a definite connection between PEMGroup and the BVI entities, as evidenced by Pang's authority to transfer funds from the BVI entities into PEMGroup accounts.

O

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

1

### CIVIL MINUTES - GENERAL

| Case No. | CV 09-2901 PSG (Ex) | Date | July 2, 2009 |
|---|---|---|---|
| Title | Securities and Exchange Commission v. Private Equity Management Group, Inc. | | |

One of the eight banks/financial houses that purchased offerings from the BVI entities is Bank Sinopac, which made its first investment with GVEC in February of 2004. *Kao Decl.* ¶ 4 & Ex. 1. The CPOM issued in connection with that offering stated that, among other things, the offering proceeds would be used to "purchase financial assets of a proprietary nature," and that the investments would generate annual interest of approximately six percent. *See id.* at ¶ 4 & Ex. 1 at pp. 2 & 4; *see also Quon Decl.* ¶ 3 (indicating that funds raised in the GVEC offerings were used to acquire life settlement contracts and would annually generate between approximately six and seven percent in interest); *Aboubakare Decl.* ¶¶ 4, 6 (approximately the same). Bank Sinopac then made other investments with GVEC in July of 2005. *Kao Decl.* ¶¶ 6-7 & Exs. 2-3. The CPOM issued in connection with this offering stated that, among other things, the offering proceeds would primarily be used to invest in "certain assets," and that the investments would generate annual interest of approximately seven percent. *Id.* at ¶ 6 & Ex. 2. As evidenced by a February 2006 meeting held in PEMGroup's Irvine, California office between Bank Sinopac representatives and Anderson and Aboubarake, the underlying assets in Bank Sinopac's investments were life settlement contracts. *Id.* at ¶¶ 9-10.

In August 2006, Bank Sinopac made an investment with GVEC II. *See id.* at ¶ 11 & Ex. 6. According to the CPOM issued in connection with this offering, the offering proceeds would be used "to acquire a portfolio of various infrastructure and timeshare assets and receivables," and, like Bank Sinopac's other investments, Bank Sinopac would receive semi-annual interest payments. *See id.* at ¶ 11 & Ex. 6.

A few months after making this investment—in October of 2006, to be exact—representatives of Bank Sinopac attended a series of meetings at PEMGroup's offices in Irvine, California. *Id.* at ¶ 14. While there, the representatives of Bank Sinopac met with Pang, who, along with Anderson and Aboubakare, discussed with the representatives the timeshare products in the GVEC II investment. *Id.* It was during this time that the representatives were brought to Napa, California to see what they were told was one of the timeshare sites underlying the GVEC II investment. *Id.* at ¶ 16. Also, during this visit, the representatives received information about a GVEC II offering concerning life settlement investments. *Id.* at ¶ 17.

One month after visiting PEMGroup in California, Bank Sinopac made its fourth investment. *Id.* at ¶ 18. This offering, made by GVEC II, concerned life insurance premium finance investments, and provided that, among other things, Bank Sinopac would receive semi-annual interest payments in the amount of approximately 6.5 percent. *Id.*

        c.     <u>Standard Chartered Bank Taiwan Ltd.'s Investments</u>

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

1

**CIVIL MINUTES - GENERAL**

| Case No. | CV 09-2901 PSG (Ex) | Date | July 2, 2009 |
|---|---|---|---|
| Title | Securities and Exchange Commission v. Private Equity Management Group, Inc. | | |

Another one of the eight banks/financial houses that purchased offerings from the BVI entities is Standard.  In 2006, Standard subscribed to a total of $255 million in Series A, Series C, and Series D Notes issued by GVECR IV.  *Hsin-Tung Decl.* ¶ 2.  The CPOMs issued in connection with this offering indicate that GVECR IV will use the "net proceeds from the sale of the Notes" "to acquire a portfolio of various infrastructure and timeshare assets and receivables." *Id.*, Ex. G at p. 3; *see also Quon Decl.* ¶ 5; *Aboubakare Decl.* ¶¶ 7-9.

>     3.     How Defendants Solicited the Investments

In soliciting the foregoing investments, Defendants made a number of representations that are relevant to this case.  They are as follows.

>     a.     The "Road Shows"

PEMGroup frequently made in-person investment presentations to prospective Taiwanese institutional investors concerning the aforementioned offerings.  *Aboubakare Decl.* ¶ 11.  Known as "road shows," these presentations were conducted by Pang, Anderson, and Aboubakare.  *Id.* During these road shows, Pang, Anderson, and Aboubakare made several representations to potential investors.  For instance, they would pitch the offerings as a protected portfolio of assets, secured by a performance bond or an insurance policy underwritten by an insurance company that carried an A- or better rating.  *Id.* at ¶ 12.  They also represented that, in the case of the GVEC offerings, their investments would primarily be used to purchase life settlement contracts and that, in the case of the GVECR IV offerings, their investments would primarily be used to purchase timeshare-related assets.  *Id.* at ¶ 13.  However, they never told investors that their funds would be used to pay principal or interest for other fund offerings, that funds would be used for loans to Pang, other entities controlled by him, or to other executives, or that the funds would be used to purchase aircraft for PEMGroup or for any of PEMGroup's operating expenses.  *Kao Decl.* ¶ 28; *Aboubakare Decl.* ¶ 13.

>     b.     The $108 Million Insurance Policy

Among other things, investors of the offerings at issue were given materials that referenced an insurance policy of $108 million that purportedly guaranteed their investments. *Aboubakare Decl.* ¶ 25.  The policy in place at the time, however, only afforded approximately $31 million in coverage.  *Id.* & Ex. 1.

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

1

### CIVIL MINUTES - GENERAL

| Case No. | CV 09-2901 PSG (Ex) | Date | July 2, 2009 |
|---|---|---|---|
| Title | Securities and Exchange Commission v. Private Equity Management Group, Inc. | | |

Also, in 2007, Pang learned that a prospective Taiwanese investor wanted proof of the $108 million policy. *Id.* at ¶ 26. As no policy existed in that amount, Pang instructed Anderson and Aboubakare to obtain coverage in that amount. *Id.* After telling Pang that they could not obtain the policy within the time constraints set by Pang (one day), Pang allegedly told Anderson and Aboubakare that he did not care how they got the policy, so long as there was evidence that such a policy existed. *Id.* Aboubakare understood this to mean that he and Anderson were to create a forged document, which is exactly what he and Anderson subsequently did. *Id.* at ¶¶ 26-27 & Ex. 2.

After creating the forged document, Anderson and Aboubakare presented the document to Pang for his approval. *Id.* at ¶ 27 Pang rejected the first draft, stating that it did not look good enough, and then requested another draft. *Id.* After he approved the second draft, Anderson and Aboubakare transmitted the forged policy to PEMGroup's Taiwan office for presentation to investors. *Id.*

This forged policy was later shown to several representatives of the Hong Kong branch of Bank Sinopac, who were visiting PEMGroup at its Irvine office to conduct due diligence in connection with Bank Sinopac's investment in certain offerings. *Kao Decl.* ¶17; *see also Aboubarake* ¶ 28. Both Pang and Anderson were present when the forged policy was presented to these representatives. *Aboubakare Decl.* ¶ 28.

####        c.    Pang's Academic and Professional Background

Pang regularly told existing and prospective investors in PEMGroup's offerings that he had graduated and received a degree from the University of California at Irvine ("UCI"), and that he had previously been employed at Morgan Stanley & Co as a vice president. *Kao Decl.* ¶ 15; *see also Cebeci Decl.*, Ex. 2, at p. 6 (indicating that an investor had been told that Pang had worked for Morgan Stanley & Co.); *Aboubarake Decl.* ¶ 34. PEMGroup's website contained these same representations. *Aboubakare Decl.*, Ex. 5.

Apparently, Pang did not make these representations to all investors. *See Cebeci Decl.*, Ex. 1, at p.5. Indeed, in a response to an investment questionnaire, Hua Nan Commercial Bank Co., Ltd., states that it had never heard the aforementioned representations concerning Pang's academic and professional background. *Id.*; *see also id.*, Ex. 2, at p. 6 (indicating that no one ever represented to Hua Nan Link No. 2 that Pang had attended or received degrees from UCI).

####        4.    The HSBC NAV Reports

**O**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**1**

### CIVIL MINUTES - GENERAL

| Case No. | CV 09-2901 PSG (Ex) | Date | July 2, 2009 |
|---|---|---|---|
| Title | Securities and Exchange Commission v. Private Equity Management Group, Inc. | | |

Certain misrepresentations were made after Defendants solicited investors. For instance, Bank Sinopac received net asset value reports ("NAV reports") from HSBC Bank USA ("HSBC") concerning its investment in GVEC II, stating the investment terms and the current net asset value per unit. *Kao Decl.* ¶ 25 & Ex. 14. Because the NAV reports were on HSBC letterhead, Bank Sinopac understood the reports to be issued by HSBC. *Id.* at ¶ 25.

In or about February 2008, a representative of a Bank Sinopac employee contacted Aboubakare regarding a statement in one of these NAV reports. *Aboubarake Decl.* ¶ 33 & Ex. 4. This struck Aboubakare as odd because he did not believe that HSBC issued net asset value statements. *Id.* at ¶ 33. After contacting an HSBC representative, Aboubarake's suspicion was confirmed: HSBC did not issue such statements. *Id.*; *see also Quon Decl.* ¶ 31 ("These documents ("NAV Reports") appeared on letterhead that included the HSBC logo. However, these documents were generated internally at PEMGroup.").

> 5. <u>The Alleged Ponzi Scheme</u>

The success of the life settlement offerings was dependent upon whether the insureds died roughly in accordance with information derived from actuarial tables. *Aboubarake Decl.* ¶ 15. By mid-2006, it became apparent that the insureds were not dying at the predicted rates. *Id.* at ¶ 16. Consequently, the policies did not pay off sufficient funds to allow the offerings to pay the principal and interest due to investors. *Id.* In particular, around this time it became apparent that the GVEC Preferred Shares, GVEC Preferred Shares A, GVEC Notes A and GVEC Preferred Shares B1 offerings were low on cash and that, without additional capital, investors would not receive the interest payments promised to them under these offerings. *Id.*

In an attempt to provide these life settlement offerings with sufficient capital to continue making the promised interest payments to investors, Pang instructed certain PEMGroup employees to utilize assets belonging to the tranches within the GVECR IV offering to purchase life insurance policies from several underperforming tranches within GVEC. *Id.* at ¶¶ 17-18. The proceeds of the sales of life insurance policies from the GVEC entities to the GVECR IV entities were then used to pay interest to and repay principal to those investors who had invested in the underperforming tranches within GVEC. *Anderson Decl.* ¶ 4; *Aboubarake Decl.* ¶¶ 17-18.

Allegedly, in late 2006, Pang told Anderson and Aboubakare, "[W]e are in a $25 million Ponzi scheme." *Aboubakare Decl.* ¶ 22. It is unclear, however, whether this in fact happened. Peter Paul Mendel ("Mendel"), an employee of PEMGroup, has stated that after the SEC filed the present case, he spoke with Anderson about the allegations underlying the complaint.

**O**

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

**1**

### CIVIL MINUTES - GENERAL

| Case No. | CV 09-2901 PSG (Ex) | Date | July 2, 2009 |
|---|---|---|---|
| Title | Securities and Exchange Commission v. Private Equity Management Group, Inc. | | |

*Mendel Decl.* ¶ 2.  Supposedly, Anderson told Mendel that he had never heard anyone, including Pang or Aboubakare, ever say that PEMGroup was involved in a Ponzi scheme.  *Id.*

      6.    <u>The Loans</u>

      a.    <u>PEMGroup Loans</u>

Beginning in at least 2007, Pang began causing multiple transfers from accounts held by the BVI entities to accounts held by PEMGroup.  For instance, on November 21, 2007, Quon emailed Pang to inform him that "[w]e have only $18k in available limit on our AMEX and I project a cash need of $1.3M by the end of next week and I haven't received the Global Exec invoice for the Dubai trip yet."  *Perez Decl.*, Ex. 1; *Quon Decl.* ¶ 12, Ex. 3 (same).  Quon then asked, "Any thoughts on how we are going to service our cash crunch?  Can you borrow funds from GVECR IV?"  *Perez Decl.*, Ex. 1; *Quon Decl.* ¶ 12, Ex. 3 (same).  Later that day, Pang responded, "Go ahead to borrow 5 mil."  *Perez Decl.*, Ex. 1; *Quon Decl.* ¶ 12, Ex. 3 (same).

One month later, Perez, the Assistant Vice President and Controller of PEMGroup, asked Pang and Quon via email whether she could transfer $1.5 million from GVEC IV to PEMGroup.  *Perez Decl.* ¶ 4 & Ex. 2; *Quon Decl.* ¶ 13 & Ex. 4.  Thirty minutes after making that request, Pang responded, "That's fine.  Thanks."  *Perez Decl.* ¶ 4 & Ex. 2; *Quon Decl.* ¶ 13 & Ex. 4.

In 2008, Pang continued to authorize tranches within the BVI entities to loan monies to PEMGroup.  On January 22, 2008, for example, he approved a transfer of $500,000 from GVECR IV to PEMGroup.  *Perez Decl.* ¶ 5 & Ex. 3; *Quon Decl.* ¶ 14 & Ex. 5.  Then, on July 28, 2008, he caused a tranche within the GVECR II offering to loan PEMGroup $3 million.  *Perez Decl.* ¶ 6 & Ex. 4; *Quon Decl.* ¶ 15 & Ex. 6.  A few months after that, on November 25, 2008, Pang caused GVECR II to loan $2 million to PEMGroup.  *Perez Decl.* ¶ 7 & Ex. 5.

Apparently, the investor funds were being used to at least partly fund PEMGroup's operating expenses.  *See, e.g., Perez Decl.* ¶ 7 & Ex. 5 (indicating that loans were used for "payroll, payment for Disney Cruise, remittance of Taipei and monthly expenses"); *see also Anderson Decl.* ¶ 5.  For instance, Pang provided his entire staff with a cruise on a Disney boat at an expense of $1 million.  *See Receiver's First Status Report* ("*FSR*") ¶ 7; *Quon Decl.* ¶ 11.  The year before the Disney cruise, Pang treated his staff to a $1.5 million trip to China.  *See FSR* ¶ 7; *Quon Decl.* ¶ 11.  Pang also used investor funds to expand PEMGroup's Beijing and Shanghai offices.  *Anderson Decl.* ¶ 5 (noting that "portfolio assets were used for, among other

O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

1

## CIVIL MINUTES - GENERAL

| Case No. | CV 09-2901 PSG (Ex) | Date | July 2, 2009 |
|---|---|---|---|
| Title | Securities and Exchange Commission v. Private Equity Management Group, Inc. | | |

things, PEMGroup operating expenses, such as an office retreat and office space in Shanghai");
*see also Quon Decl.* ¶ 11; *Aboubarake Decl.* ¶ 24.

To date, approximately $16 million in loans made to PEMGroup from the BVI entities remain outstanding. *FSR* ¶ 7; *Quon Decl.* ¶ 17.

  b.    Loans to Pang and Entities He Controlled

During the relevant time period, Pang also took, on behalf of himself or companies that he controls, somewhere between $9.5 million and $11 million in unsecured loans from the tranches. *Compare FSR* ¶ 7 & *Perez Decl.* ¶¶ 12-13 & Ex. 14 *with Anderson Decl.* ¶ 3. For instance, on January 31, 2008, Pang approved a $2 million loan from GVECR IV to LSPC, Inc., which is an entity owned by Pang. *Quon Decl.* ¶ 18 & Ex. 8. Then, on April 22, 2008, Perez transferred $1 million from a GVECR IV entity to an account designated by Pang that does not appear to be connected to PEMGroup or the investors. *Perez Decl.* ¶ 9; *Quon Decl.* ¶ 19 & Ex. 10. In addition to the foregoing, on April 23, 2008 Pang instructed Quon to transfer $1.5 million to another entity controlled by Pang, Nevada Capital Development Partners. *Quon Decl.* ¶ 20 & Ex. 11.

In total, it appears that beginning in 2008, Pang took "personal loans" in the amount of $9.5 million, of which only $2.6 million has been repaid. *See Perez Decl.* ¶ 12 & Ex. 14; *FSR* ¶ 7; *Quon Decl.* ¶ 23; *cf. Anderson Decl.* ¶ 3 (estimating that $8 million remains unpaid). No contemporaneous formal documentation was created in connection with the loans from the BVI entities to Pang and/or the various entities he controls. *Quon Decl.* ¶ 23.

  7.    The Commissions

Pang charged millions of dollars in excessive commissions. *Anderson Decl.* ¶ 6. Although these commissions were supposed to be paid to PEMGroup after it had succeeded in acquiring the pertinent life insurance contracts, Pang, beginning in late 2007, began directing PEMGroup to pay "commissions" on life insurance deals that had not yet closed. *FSR* ¶ 7. The money that was used to pay these "commissions" was borrowed from several of the GVEC entities. *Id.* In total, about $13 million was borrowed from investors to pay these "commissions" to PEMGroup investors. *Id.*; *see also Anderson Decl.* ¶ 6.

Notably, the deals upon which the aforementioned commissions were based were never consummated. *FSR* ¶ 7; *Quon Decl.* ¶ 25. Despite this, the money was not returned to the

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

1

### CIVIL MINUTES - GENERAL

| Case No. | CV 09-2901 PSG (Ex) | Date | July 2, 2009 |
|---|---|---|---|
| Title | Securities and Exchange Commission v. Private Equity Management Group, Inc. | | |

tranches. *FSR* ¶ 7. Rather, it was split – 25% to PEMG to support its operation and 75% to companies owned and controlled by Pang. *Id.* There is no loan documentation surrounding these transactions. *Id.*

8.     The Aircraft Purchases

Defendants also used investor money to fund the purchase of two jets. *Anderson Decl.* ¶ 7; *Perez Decl.*, Ex. 16 (letter from Pang and Quon authorizing the transfer of $11 million for the purpose of purchasing the aircraft); *Quon Decl.* ¶ 27. The subject of purchasing a corporate aircraft was first discussed at a PEMGroup board meeting. *Aboubakare Decl.* ¶ 23. Although Aboubakare expressed concern at the meeting that PEMGroup did not have sufficient funds to purchase an aircraft, Pang allegedly replied that he would "find a way" to make the purchase happen. *Id.* Apparently, Pang was able to obtain funds for the purchase of the aircraft by ordering the loans of somewhere between $11 million and $15 million from certain of the GVEC II and/or GVECR IV timeshare offerings to Inter Travel and Services, Inc. ("ITS"), an entity that is controlled by PEMGroup. *Perez Decl.*, Ex. 11; *Anderson Decl.* ¶ 7; *Quon Decl.* ¶ 27; *Aboubakare Decl.* ¶ 23. It appears that investors were never told that their funds would be used to purchase these aircrafts. *Kao Decl.* ¶ 28; *Aboubakare Decl.* ¶ 23.

In total, it is estimated that Pang purchased three executive jet aircraft for an amount exceeding $35 million. *FSR* ¶ 7.

9.     Aboubarake's Theft of $4 Million

During the relevant time period, Aboubakare misappropriated approximately $4.6 million from investors. *FSR* ¶ 7; *Quon Decl.* ¶ 28. When confronted about this misappropriation, Aboubarake agreed to repay approximately $4 million. *Quon Decl.* ¶ 29. Aboubarake eventually did repay this money. *FSR* ¶ 7; *Quon Decl.* ¶ 29. However, it was not returned to investors. Instead, it was paid to Pang and several other PEMGroup employees, including Quon. *FSR* ¶ 7; *Quon Decl.* ¶ 30.

III.    Discussion

Presently before the Court is the SEC's application for preliminary injunction, to which Pang has filed an opposition. However, before turning to the issue of whether the SEC has established a prima facie case of previous violations of federal securities laws, the Court first

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

1

### CIVIL MINUTES - GENERAL

| Case No. | CV 09-2901 PSG (Ex) | Date | July 2, 2009 |
|---|---|---|---|
| Title | Securities and Exchange Commission v. Private Equity Management Group, Inc. | | |

addresses Pang's contention that the Court should strike the declarations of Messrs. Quon, Aboubakare, and Anderson, and portions of Ms. Cebeci's declaration.

A.   Whether the Court Should Strike the Declarations of Messrs. Quon, Aboubarake, and Anderson, and Portions of the Declaration of Ms. Cebeci

It is Pang's position that the Court should strike the aforementioned declarations on various grounds, depending on the declaration at issue. Accordingly, the Court takes up Pang's contention in relation to each declaration, beginning first with Quon's and Aboubarake's.

1.   Whether to Strike Quon and Aboubakare's Declarations

Pang argues that the Court should strike the declarations of Quon and Aboubakare for essentially two reasons. First, he contends that the SEC should not be allowed to use the declarations of witnesses who invoked their Fifth Amendment privileges during depositions in order to avoid any cross-examination of their testimony.[3] And, second, he argues that these declarations are inherently unreliable and, therefore, should not be considered by the Court. For the reasons that follow, the Court believes that striking these declarations is inappropriate.

As an initial matter, the Court notes that there appears to be no dispute that on May 14, 2009, Quon did in fact regularly invoke the Fifth Amendment numerous times while being deposed by Pang's counsel, *see Regenstreif Decl.*, Ex. 2, and that on June 10, 2009, Aboubakare did the same. The only dispute here is whether striking these two declarations is an appropriate sanction.

In support of his position that striking the declarations is in fact warranted, Pang cites to three circuit opinions, wherein the circuit courts affirmed the lower courts' decisions to sanction a party when he or his witness refused to answer questions on cross-examination. The first case

---

[3] To be sure, in his opposition, Pang initially argued that the Court should strike Anderson's declaration because Anderson invoked his Fifth Amendment privilege, and contended that the Court should strike Aboubakare's declaration because Aboubakare had avoided having his deposition taken. However, at oral argument, it was brought to the Court's attention that subsequent to the filing of the SEC's reply brief, Aboubakare had in fact been deposed, and that, at the deposition, Aboubakare invoked his Fifth Amendment privilege in response to all questions directed at his declaration. In light of these new facts, Pang abandoned his initial argument with respect to Aboubakare, and instead requested the Court strike Aboubakare's declaration on the ground that he had invoked his Fifth Amendment privilege during his deposition.

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

1

### CIVIL MINUTES - GENERAL

| Case No. | CV 09-2901 PSG (Ex) | Date | July 2, 2009 |
|----------|---------------------|------|--------------|
| Title | Securities and Exchange Commission v. Private Equity Management Group, Inc. | | |

cited by Pang, *United States v. King*, 200 F.3d 1207 (9th Cir. 1999), involved an appeal from a conviction of bank fraud and wire fraud. Among other things, the defendant challenged his conviction on the ground that the district court erred when it allowed the prosecution to impeach his direct testimony by continuing to elicit his unprivileged refusal to answer. *Id.* at 1217. After observing that "[o]nce a defendant testifies, he exposes himself to full cross-examination concerning matters relevant to his testimony," the Ninth Circuit went on to note that when a defendant refuses to answer questions on cross-examination, a district court may impose a number of sanctions, including the one assessed in that case and the one requested in this case, striking a witness' testimony. *Id.* at 1216-17 (citations omitted).

The other two circuit opinions cited by Pang are out-of-circuit opinions. In *In re Edmond*, 934 F.2d 1304 (4th Cir. 1991), the Fourth Circuit reviewed a lower court's decision to strike a moving party's affidavit submitted in support of its motion for summary judgment. On review, the Fourth Circuit first observed that by invoking his Fifth Amendment privilege, the moving party had attempted to insure that his unquestioned, unverified affidavit would be the only version of facts before the court. *Id.* at 1308. But, according to the Fourth Circuit, "[T]he Fifth Amendment privilege cannot be invoked as a shield to oppose depositions while discarding it for the limited purpose of making statements to support a summary judgment motion." *Id.* Accordingly, the Fourth Circuit went on to affirm the lower court's decision to strike the moving party's affidavit. *Id.*

A similar result was reached in *Lawson v. Murray*, 837 F.2d 653 (4th Cir. 1988). There, the defendant presented Larry Bellamy ("Bellamy") as a witness. On cross-examination, Bellamy invoked his Fifth Amendment privilege against self-incrimination. *Id.* at 655. Upon doing so, the prosecutor requested that the trial court strike Bellamy's testimony in chief. *Id.* The trial court eventually granted this request, and later found the defendant guilty of the charges asserted against him. *Id.* The district court, on review of the defendant's habeas petition, concluded that the trial judge's striking of Bellamy's testimony worked an unconstitutional denial of the defendant's right to present witnesses in his defense. *Id.* The Fourth Circuit, however, disagreed. As an initial matter, the Fourth Circuit stated that a defendant's right to present witnesses in his own defense does not carry with it the right to immunize the witness from reasonable and appropriate cross-examination. *Id.* The Fourth Circuit then went on to note that "[t]he fifth amendment provides no immunity from cross-examination for a witness who elects to testify; it is not a 'positive invitation to mutilate the truth a party offers to tell.'" *Id.* at 656 (quoting *Brown v. United States*, 356 U.S. 148, 156, 78 S. Ct. 622, 2 L. Ed. 2d 589 (1958)). After reviewing these principles, the Fourth Circuit then determined that the trial judge had issued an appropriate sanction. *Lawson*, 837 F.2d at 656.

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

1

### CIVIL MINUTES - GENERAL

| Case No. | CV 09-2901 PSG (Ex) | Date | July 2, 2009 |
|---|---|---|---|
| Title | Securities and Exchange Commission v. Private Equity Management Group, Inc. | | |

The SEC argues that these cases are inapposite because of the differences in the procedural postures of those cases and the procedural posture of this case. More specifically, the SEC contends that since preliminary injunctions are customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits, *see Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981), the Court need not strike the declarations of these witnesses simply because they hindered Pang's efforts to cross-examine them.

This Court is not aware of any case that has dealt with this exact issue in depth, nor do the parties direct the Court to any case directly on point. Indeed, as far as this Court is aware, only one court has addressed this issue in the context of an application for temporary restraining order or preliminary injunction. In *Two Wheel Corp. v. Am. Honda Corp.*, 506 F. Supp. 806 (E.D.N.Y. 1980), a district court in the Eastern District of New York stated in a footnote that it exercised its discretion to not consider the affidavits of some witnesses because they had not been subjected to cross examination. *Id.* at 816 n.11. However, as the district court did not engage in much analysis on this issue, *Two Wheel Corp.* is largely unhelpful to this Court. Nevertheless, while the immediate issue is unusual, the Court is not without guidance in resolving it.

The decision of whether to grant a motion to strike is committed to the sound discretion of the Court. *See El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1038 (9th Cir. 2003); *see also U. S. v. Cardillo*, 316 F.2d 606, 613 (2nd Cir. 1963) ("[W]hether all or a part of the testimony should be stricken, must depend upon the discretion of the trial judge exercised in the light of the particular circumstances."); *Two Wheel Corp.*, 506 F. Supp. at 816 n.11. In exercising this discretion, courts generally have to balance competing concerns that are distinctive to the particular action at hand. Such is the case here. On the one hand, the Court does not want to make routine the practice of considering declarations of witnesses who have asserted the Fifth Amendment privilege during a deposition. For obvious reasons, this Court wants to have a full picture of the particular facts of each case before it renders a decision. Given that cross-examination "test[s] the credibility of the witness and the truthfulness of his earlier testimony," *Lawson*, 837 F.2d at 656, this Court is reluctant to issue a ruling based on evidence that has not yet been effectively tested.

At the same time, though, the Court must acknowledge that applications for preliminary injunctions, on the one hand, and motions for summary judgment and trials, on the other hand, are of a different ilk. *Camenisch*, 451 U.S. at 395; *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d

O

1

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 09-2901 PSG (Ex) | Date | July 2, 2009 |
|---|---|---|---|
| Title | Securities and Exchange Commission v. Private Equity Management Group, Inc. | | |

1389, 1394 (9th Cir. 1984).  There is good reason why courts apply the Federal Rules of Evidence with less force at the preliminary injunction stage than they do at later stages in the proceedings.  Such is often necessary given the emergency circumstances under which applications for preliminary injunctions are submitted.  *Camenisch*, 451 U.S. at 395 ("[G]iven the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.").

In balancing these competing concerns, the Court understands that its discretion must be guided by "reason and fairness."  *See King*, 200 F.3d at 1217 (citing *Panza*, 612 F.2d at 439).  Using reason and fairness as guides, the Court believes that it is inappropriate to strike the declarations of Quon and Aboubakare simply because these witnesses invoked their Fifth Amendment privileges at their deposition.  As noted above, one of the primary benefits of cross-examination is to test the truthfulness of a witness' testimony.  *Lawson*, 837 F.2d at 656.  And, oftentimes, cross-examination is the *only* way to ensure that evidence is in fact credible.  Importantly, though, this case is not one of those cases where cross-examination is necessary to complete this task.  Rather, this is a case where the Court can test the truthfulness of the witness' testimony by cross-referencing his testimony with the (challenged *and* unchallenged) testimony of other witnesses, as well as a plethora of unchallenged documents.  It is of great significance that Quon's and Aboubakare's declarations do not only corroborate each other's stories, but they also corroborate the stories told by Anderson, Perez, and the Receiver.  *See generally Anderson Decl.*, *Perez Decl.*, *FSR*.  It is also of great significance that many of the documents on which Quon's declaration are based are in fact attached to a declaration submitted by Pang, *see Regenstreif Decl.*, and are also attached to Perez's declaration, which Pang has not objected to.

The point being made here is that this is not a case where it is unclear whether the declarant's testimony is reliable and where cross-examination is a necessary tool.  Rather, this is a case where the reliability and credibility of the challenged declarations can easily be assessed (and confirmed) by cross-referencing the other evidence in the record.  Accordingly, striking these declarations is unwarranted.

Now it should be noted that in ruling as it does now, the Court does not mean to suggest that the invocation of the Fifth Amendment has no consequence in this case.  Indeed, this fact undoubtedly has relevance.  However, that relevance goes more to weight than anything else.  *See Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

**O**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**1**

## CIVIL MINUTES - GENERAL

| Case No. | CV 09-2901 PSG (Ex) | Date | July 2, 2009 |
|---|---|---|---|
| Title | Securities and Exchange Commission v. Private Equity Management Group, Inc. | | |

Therefore, for the foregoing reasons, the Court denies Pang's request to strike the two declarations on the ground that Quon and Aboubarake invoked the Fifth Amendment at their depositions. So too does the Court deny Pang's request to strike the two declarations on the ground that they are inherently unreliable. Granted, given their admitted complicity in the alleged securities fraud and checkered pasts, the Court has every reason to look skeptically upon Quon's and Aboubarake's testimony. However, as noted above, these two individuals' testimony is largely consistent with all other evidence that has so far been proffered in this case, including that evidence submitted by people not complicit in the alleged fraud. Accordingly, the Court finds that while Quon's and Aboubarake's motives in providing the testimony are undoubtedly relevant to this case, those motives and all other indicia of unreliability are more properly relegated to the issue of weight. *See Oakland Tribune*, 762 F.2d at 1377.

### 2. Whether to Strike Anderson's Declaration

Pang also requests that the Court strike the declaration of Anderson for two alternative reasons. First, Anderson avoided having his deposition taken. And, second, his declaration is also supposedly "inherently unreliable." Both of these arguments can be rejected for the same reason.

Striking a witness' direct testimony is an "extreme sanction," *United States v. Seifert*, 648 F.2d 557, 561 (9th Cir. 1980), one that should only be employed by a court after a party has demonstrated that she has taken adequate steps to protect her own rights. Here, Pang has not taken these steps. Anderson never appeared for his deposition. *Regenstreif Decl.* ¶ 15. But rather than bring a motion to compel, Pang instead has chosen to raise this issue at this juncture. It is not the province of this Court to ensure that parties protect their own rights. Pang should have taken adequate steps to protect his rights. His failure to do so preludes him from now succeeding on this argument.[4]

For similar reasons, the Court disagrees that whatever "inherent[] unreliability" this declaration has is cause to strike it. The Court understands that there are indeed facts before the Court that suggest that the testimony of Anderson is unreliable, and that Anderson's declaration is largely conclusory. There are also various instances where Anderson had an opportunity to

---

[4] In ruling as it does now, the Court does not mean to imply that Anderson's failure to appear at properly served and noticed deposition has no consequences. Indeed, this fact will go to the weight the Court will give his statements. *Oakland Tribune*, 762 F.2d at 1377.

O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

1

### CIVIL MINUTES - GENERAL

| Case No. | CV 09-2901 PSG (Ex) | Date | July 2, 2009 |
|---|---|---|---|
| Title | Securities and Exchange Commission v. Private Equity Management Group, Inc. | | |

corroborate Aboubarake's testimony but suspiciously failed to do so.[5]  But each of these facts goes to weight.  They do not, however, provide a sufficient basis for striking Anderson's declaration.

> 3.       Whether to Strike Portions of Cebeci's Declaration

Lastly, the Court addresses Pang's argument that the Court should strike those portions of Cebeci's declaration concerning what Gibson, Dunn and Aboubarake allegedly told the SEC. Pang's request to strike rests in part on his assertion that none of the Gibson Dunn lawyers mentioned in the declaration have been willing to appear at properly noticed depositions. *Regenstreif Decl.* ¶¶ 16-17.  As noted above, it was incumbent upon Pang to take appropriate action to protect his rights.  Accordingly, his failure to do so is reason enough to reject this argument.

Pang also argues that the Court should strike this declaration because it contains hearsay. However, as noted above, at this stage in the proceedings, the Court can consider evidence that does not conform with the Federal Rules of Evidence, or that would otherwise be inadmissible at a trial on the merits.  *See Flynt*, 734 F.2d at 1394 (rejecting appellant's argument that the district court improperly considered affidavits based on hearsay); *see also Camenisch*, 451 U.S. at 395.

> 4.       Conclusion

Based on the foregoing, the Court denies Pang's requests to strike the declarations of Messrs. Quon, Aboubarake, Anderson, and Ms. Cebeci.

> B.       Whether the SEC Has Established a Prima Facie Case of Securities Fraud

The Court next considers whether Plaintiff has established a prima facie case of previous violations of Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934.  In order to establish violations of both of these sections, the SEC must prove (1) that Defendants made a material misstatement or omission (2) in connection with the offer or sale of a security (3) by means of interstate commerce.  *SEC v. Phan*, 500 F.3d 895, 907-08 (9th Cir. 2007).  Violations of these sections require scienter.  *Id.* at 908.

---

[5] For example, Aboubarake has testified that Pang admitted to him and Anderson, "[W]e are in a $25 million Ponzi scheme."  *Aboubakare Decl.* ¶ 22.  Anderson's declaration, however, makes no mention of this statement.

O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

1

### CIVIL MINUTES - GENERAL

| Case No. | CV 09-2901 PSG (Ex) | Date | July 2, 2009 |
|----------|----------------------|------|--------------|
| Title | Securities and Exchange Commission v. Private Equity Management Group, Inc. | | |

Pang essentially argues that the SEC cannot establish any of these elements and, for that reason, the Court should not issue the preliminary injunction. However, for the reasons explained below, the Court disagrees.

> 1.   <u>Whether Defendants Made Material Misstatements of Omissions in Connection with the Offer or Sale of a Security</u>

A review of the record indicates that the SEC has in fact presented sufficient evidence to demonstrate actionable misrepresentations and omissions on the part of Defendants in the sale or offer of securities. For example, there is evidence that Defendants presented investors with falsified documents. Indeed, as shown by the SEC, Pang authorized and approved a forged insurance policy, which was later shown to Bank Sinopac. *See Aboubarake Decl.* ¶¶ 27-28; *Kao Decl.* ¶ 17.

Not only did Defendants present investors with falsified documents, but Defendants also misrepresented to investors the source of their interest payments. Defendants never informed Bank Sinopac that interest payments for its life settlement investments would be paid from funds that PEMGroup had received from investors in the timeshare investments. *Kao Decl.* ¶ 28.

Defendants also neglected to mention to investors that their monies would be used to provide loans to PEMGroup, Pang, and entities within Pang's control. The record is clear: Defendants used portfolio assets to fund certain PEMGroup operating expenses, such as increasing office space abroad. *Perez Decl.* ¶ 7 & Ex. 5; *Anderson Decl* ¶ 5; *Quon Decl.* ¶ 11; *Aboubarake Decl.* ¶ 24. Defendants also used portfolio assets to take PEMGroup employees on a $1.5 million trip to China as well as a cruise on a Disney boat at an expense of $1 million. *FSR* ¶ 7; *Quon Decl.* ¶ 11. In addition to these expenses, Defendants used more than $35 million in investor monies to purchase executive jet aircrafts for PEMGroup. *See FSR* ¶ 7; *cf. Anderson Decl.* ¶ 7 ("I have also determined . . . that the purchases of two jets were initially funded with investor money."); *Aboubarake Decl.* ¶ 23. These costs were never disclosed to investors. *FSR* ¶ 7.

In addition to the foregoing, the SEC has sufficiently demonstrated that Pang misappropriated investor funds for personal use. Starting in late 2007, Pang authorized the payment of $13 million in advance commissions for life insurance policies that were scheduled to be purchased in 2008. *See FSR* ¶ 7. Despite the fact that these policies were never purchased, the commissions were never returned to the investor funds. *Id.*; *cf. Anderson Decl.* ¶ 6. There is also evidence that Pang took, on behalf of himself or companies that he controls, approximately

**O**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**1**

### CIVIL MINUTES - GENERAL

| Case No. | CV 09-2901 PSG (Ex) | Date | July 2, 2009 |
|----------|---------------------|------|--------------|
| Title | Securities and Exchange Commission v. Private Equity Management Group, Inc. | | |

$11 million in unsecured loans from PEMGroup.  *See Anderson Decl.* ¶ 3; *see also FSR* ¶ 6; *Perez Decl.* ¶¶ 12-13 & Ex. 14.

Now it is Pang's position that these claims of excessive and improper expenses by Defendants are not cognizable claims under the federal securities laws for three different reasons.  First, there is no evidence that these omissions occurred "in connection with" the sale of securities.  Second, at most, these transactions, if unjustified or unauthorized, would amount to violations of a fiduciary duty owed by Defendants to investors; they would not, however, constitute fraud in connection with the sale of securities.  Lastly, Pang contends that the SEC has failed to show that these expenses were improper under the CPOMs.  Each of these arguments can, however, be rejected for similar reasons.

Of note, three facts are undisputed.  First and foremost, Defendants represented to potential investors that they would invest their funds.  Second, the CPOMs were provided to potential investors in connection with the sale of securities.  It is also undisputed that these CPOMs provide that PEMGroup is entitled to certain fees on the monies raised from the Taiwanese banks for the BVI entities, *see, e.g., Regenstreif Decl.*, Ex. 8 at 6, and that the BVI entities had wide latitude and discretion on how investor monies would be used.  *See id.*, Ex. 10 at 22-23 ("The Issuer will invest any remaining capital assets as recommended by the Issuer Investment Committee and directed by the Manager.  These assets may consist of real estate . . . securities . . . asset backed debt financing . . . and any other business opportunities at the discretion of the Manager."); *see also id.* at Ex. 8 at p. 4.

Beginning first with the CPOMs, Pang seizes on the aforementioned provisions, and other provisions in the same vein, as evidence that Defendants' expenditures were entirely justified under the relevant agreements.  But surely this cannot be the case.  While the investors may have agreed to provide PEMGroup with certain fees, implicit in that arrangement is a promise that the fees would only be paid for work performed.  Pang cannot honestly believe that the parties to the agreements contemplated that PEMGroup would be able to retain millions of dollars in unearned commissions for transactions that were never consummated.  Similarly, while the CPOMs may have granted PEMGroup discretion to invest the monies raised from investors, certainly the CPOMs did not grant PEMGroup discretion to use the monies raised to fund lavish operating expenses.

Perhaps most importantly of all, in speaking with potential investors, Pang and other PEMGroup employees represented that they would in fact *invest* the investors' monies (primarily) in two different investment plans—those related to life settlement contracts and those

O

1

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 09-2901 PSG (Ex) | Date | July 2, 2009 |
|---|---|---|---|
| Title | Securities and Exchange Commission v. Private Equity Management Group, Inc. | | |

related to timeshares. However, there is sufficient evidence that demonstrates that rather than invest those monies, Defendants repeatedly made loans to PEMGroup and other entities that Pang owned, many of which have never been repaid. Certainly when the investors purchased securities from Defendants, they did not envision that Defendants would engage in such lending practices, particularly when those practices yield absolutely no benefit to the investors.

The Court recognizes that not every misappropriation of investor monies amounts to a violation of the federal securities laws. *See generally SEC v. Zandford*, 535 U.S. 813, 820, 122 S. Ct. 1899, 153 L. Ed. 2d 1 (2002) ("While the statute must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b), neither the SEC nor this Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of the Act.") (internal citations omitted). But where, as here, the misappropriations coincide with the sale of securities, the misappropriations are properly considered violations of the federal securities laws. *See id.* at 822. The investors in this case were led to believe that their investments would primarily be used to purchase life settlement contracts or timeshares. However, their investments were used to pay unearned fees, fund an exorbitant overhead that remains unjustified and unexplained, and make loans to PEMGroup, Pang and entities that he owns. Investors were also led to believe that their investments were covered by a certain amount in insurance, when this was not in fact the case. And, lastly, they were told that their interest payments would come from the profits of certain assets, when in fact some of these payments came from funds that PEMGroup received from investors in other investments. For these reasons, the Court finds that the SEC has successfully established previous violations of the federal securities laws.[6]

### 2.    Whether the Court Has Jurisdiction Over this Case

In addition to arguing that there is insufficient evidence that Defendants made material misstatements or omissions in the offer or sale of securities, Pang also argues that there is insufficient evidence that they did so by means of interstate commerce.[7]

---

[6] As the Court finds these instances of conduct to be sufficient evidence of Defendants' past violations of the federal securities laws, the Court declines to consider the significance of the other instances of Defendants' conduct that the SEC believes constitutes the same violations.

[7] At an earlier stage in this proceeding, Pang argued strenuously that the investments at issue were not "securities" as that term is understood under the federal securities laws. It since appears that Pang has abandoned that argument. *See Opp.* at 25:14-15. However, even if Pang's opposition could be read to place at issue whether the investments are securities, clearly they are. Under the Securities Act, "security" has a "broad" definition sufficient "to encompass virtually any instrument that might be sold

O

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

1

### CIVIL MINUTES - GENERAL

| Case No. | CV 09-2901 PSG (Ex) | Date | July 2, 2009 |
|---|---|---|---|
| Title | Securities and Exchange Commission v. Private Equity Management Group, Inc. | | |

Pang is correct that each of the federal statutory provisions under which the SEC has asserted claims "extends its proscriptions to certain forms of fraudulent activity conducted by the use of 'any means or instrumentality of transportation or communication' in commerce between the states or between any foreign country and a state." *Grunenthal GmbH v. Hotz*, 712 F.2d 421, 423-24 (9th Cir. 1982). Thus, "[t]here must . . . be some degree of connection between the fraud and conduct in, or effects on, the United States." *Id.* at 424. However, for the reasons that follow, the Court disagrees with Pang that such a connection is absent in this case.

The principles governing jurisdiction in a case like this are clearly set out in *Grunenthal*. First, "consistent with the established objectives of the federal securities laws, we have recognized that 'the jurisdictional hook need not be large to fish for securities law violations.'" *Id.* (citations omitted). Nonetheless, "[t]he conduct in the United States cannot be merely preparatory . . . [it] must be material, that is directly cause the losses." *Id.* As the Ninth Circuit later explained in *Butte Mining PLC v. Smith*, 76 F.3d 287 (9th Cir. 1996), "Vigilant and mature as our securities laws are, they are not to be invoked unless substantial steps in the perpetuation of the fraud were taken here or the criminal conduct engaged in affected our securities markets or American investors." *Id.* at 291.

In support of his position that the conduct in this case is "merely preparatory," Pang attempts to draw an analogy between this case and *Butte Mining*. However, this attempt is in vain. In *Butte Mining*, the plaintiffs' federal securities law claim against the defendants was based on a stock swap between one of the plaintiffs and fifteen United Kingdom companies. In finding that the federal securities laws did not apply in that case, the Ninth Circuit emphasized that the "United States [was] not a haven for the Defendants because except for [one of the defendants] and his lawyer, they are not here and have not operated from here." *Id.* at 291. Indeed, the scheme alleged therein "was devised abroad and completed in the United Kingdom." *Id.*

---

as an investment." *See SEC v. Edwards*, 540 U.S. 389, 393, 124 S. Ct. 892, 157 L. Ed. 2d 813 (2004) (citation omitted). This definition includes "any note, stock, treasury stock, security future, bond, debenture, . . . investment contract, . . . [or any] instrument commonly known as a 'security.'" *Id.* As indicated by the partial private placement memorandum for the life settlement contract investments submitted by Plaintiff, *see Cebeci Decl.*, Exs. 2-3, the transactions at hand involve notes. Thus, they are presumptively securities. *SEC v. J.T. Wallenbrock & Assocs.*, 313 F.3d 532, 536 (9th Cir. 2002). The particular scheme at hand also appears to be an investment contract, as it involves "an investment of money in a common enterprise with profits [that] come solely from the efforts of [Defendants]." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301, 66 S. Ct. 1100, 90 L. Ed. 1244 (1946).

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

1

### CIVIL MINUTES - GENERAL

| Case No. | CV 09-2901 PSG (Ex) | Date | July 2, 2009 |
|----------|---------------------|------|--------------|
| Title | Securities and Exchange Commission v. Private Equity Management Group, Inc. | | |

Unlike the defendants in *Butte*, many of the "substantial steps" that Defendants took in perpetuation of the fraud at hand were taken and completed in the United States. Indeed, the record is replete with numerous examples of emails sent, ostensibly from the United States,[8] in which Pang approves the misappropriation of funds from investors to either PEMGroup, himself, or entities under his control. For instance, on November 26, 2007, Pang caused GVEC IV 2006 C to lend $1.5 million to PEMGroup for a trip to Dubai. *See Perez Decl.* ¶ 3 & Ex. 1. The aforementioned Disney cruise and trips to Taipei were also paid out of investor funds, and were explicitly approved by Pang. *See id.* at ¶ 7 & Ex. 5. So too is there uncontroverted evidence that Pang took personal loans from investment funds. *See id.* at ¶ 12 & Ex. 14.

In addition to the foregoing, there is also evidence that some of the investors in this case actually came to the United States to receive assurances with respect to their potential investments. Most notably, two representatives from Bank Sinopac traveled to Irvine, California in October of 2006 to conduct due diligence on a timeshare offering they were planning on purchasing. *Kao Decl.* ¶ 14. While in Irvine, these representatives also received information concerning the life settlement offerings, which they eventually invested in. *See id.* Besides attending meetings in Irvine, the representatives also visited Napa, California to view the timeshare assets they were planning on investing in. *Id.* at ¶ 16.

As the foregoing demonstrates, this is not a case, like *Butte*, where a scheme was devised abroad and completed abroad. Rather, it appears that the decisions made by Pang regarding how to use the investors' monies were largely made from the United States. For this reason alone, the Court finds that, contrary to Pang's arguments otherwise, the conduct in this case was not "merely preparatory." Rather, as the conduct that took place in this country was significant with respect to the alleged violations and furthered the fraudulent scheme, the Court finds the conduct to be material, thereby supporting a finding that the Court does indeed have jurisdiction in this case. *See Grunenthal*, 712 F.2d at 425.

C.   <u>Whether the SEC Has Established a Reasonable Likelihood that the Wrong Will Be Repeated</u>

---

[8] As the signature line of each email indicates that Pang is located in Irvine, it appears that these emails were in fact sent from the United States. Indeed, Pang has not presented any evidence to the contrary. Additionally, the Court notes that the fact that these emails were written by Pang is reason enough to reject Pang's overarching argument that the alleged misconduct is not tied to him.

O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

1

### CIVIL MINUTES - GENERAL

| Case No. | CV 09-2901 PSG (Ex) | Date | July 2, 2009 |
|----------|---------------------|------|--------------|
| Title | Securities and Exchange Commission v. Private Equity Management Group, Inc. | | |

Having determined that the SEC has established a prima facie case of past violations of the federal securities laws, the next and final step in the Court's analysis is to determine whether the SEC has established that there is a reasonable likelihood that the wrong will be repeated.  *See SEC v. Mgm't Dynamics*, 515 F.2d 801, 807 (2d Cir. 1975).

As the SEC correctly notes, the Ninth Circuit has recognized that an inference arises from a defendant's past violations that future violations are likely to occur.  *See SEC v. Koracorp Indust., Inc.*, 575 F.2d 692, 698 (9th Cir. 1978).  But more importantly, a careful review of the record demonstrates that there is a reasonable likelihood that the wrong will be repeated.  The infractions at issue were not isolated occurrences.  They spanned a number of years with respect to a number of different investors.  Thus, the Court believes that an inference can be properly drawn that there is reasonable likelihood that the wrong will be repeated.  Indeed, nowhere in his opposition does Pang make any assurances to suggest otherwise.

For the foregoing reasons, the court finds that the SEC has established that there is a reasonable likelihood that the wrong will be repeated.

IV.    Conclusion

Based on the foregoing, the Court GRANTS the SEC's application for preliminary injunction and appointment of permanent receiver.

**IT IS SO ORDERED.**

O

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

1

### CIVIL MINUTES - GENERAL

| Case No. | CV 09-2901 PSG (Ex) | | Date | July 2, 2009 |
|---|---|---|---|---|
| Title | Securities and Exchange Commission v. Private Equity Management Group, Inc. | | | |