# EXHIBIT 1

Robert P. Mosier
Craig M. Collins, CPA
**MOSIER & COMPANY, INC.**
3151 Airway Avenue, Suite A-1
Costa Mesa, California  92626
Telephone:  (714) 432-0800
Facsimile:   (714) 432-7329
E-Mail:  rmosier@mosierco.com

Court Appointed Receiver

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | CASE NO. 09-CV-2901 PSG (EX) |
| | Assigned to:   Hon. Philip S. Gutierrez |
| Plaintiff, | **RECEIVER'S FINAL ACCOUNT AND REPORT** |
| v. | DATE:     December 19, 2016<br>TIME:      1:30 p.m.<br>CTRM:    Courtroom 880 Roybal |
| PRIVATE EQUITY MANAGEMENT GROUP, LLC; PRIVATE EQUITY MANAGEMENT GROUP, INC.; AND DANNY PANG, | |
| Defendants. | |

Robert P. Mosier, the duly appointed Receiver for Private Equity Management Group, LLC, Private Equity Management Group, Inc. and related entities (collectively "PEMG"), respectfully submits this Final Account and Report ("FAR") for the roughly seven year duration of the Receivership from April 23, 2009 through September 2016 (except where otherwise noted). The Receivership is in its eighty-ninth month of administration or approximately seven years, five months since inception.

**Organization:** The Report is organized into five sections: (A) Reason for Filing the FAR at This Time; (B) Overview of the Receivership Estate; (C) Accounting Data and Professional Fees; (D) Remaining Tasks to be Completed; and (E) Forecast for the Final Distribution. Your Receiver respectfully represents the following:

I. **REASON FOR FILING THE FAR AT THIS TIME**

A. Requested by the Investors:

As noted below, there are a few minor assets that are not fully administered. This suggests that closing the Receivership Estate at this time is premature. However, 98% of the investor groups in Taipei (including the six regulated banks and one investment company) have now urged the Receiver to close the case as quickly as possible. There are five assets to be assigned to an "escrow agent" who will complete the administration outside of the receivership. See Exhibit "A." The Receiver does not object to this assignment.

II. **OVERVIEW OF THE RECEIVERSHIP ESTATE**

A. Overview of the Asset Recovery and Net Recovery:

During the past seven years, the Receivership Estate (a) sold 54 assets for $151.0 million in gross sale proceeds, (b) compromised three dozen life insurance policies that either matured or were settled in litigation for another $36.0 million, (c) transferred another 237 life policies to the investors for an assigned value of $129.3 million, (d) collected $18.4 million in litigation proceeds, and (e) generated

$22.8 million in interest and other income. The total gross recovery is $377.6 million. After expenses (discussed below), the investors are expected to initially recover $247.9 million. Given a net investment at the commencement of the Receivership of $797.9 million,[1] the recovery as a percentage of net investment is forecast to be approximately 31.1%.[2] See Exhibit "B."

B. <u>Summary of Expenses of the Receivership Estate:</u>

Major expenditures during the Receiver's administration include the following: (a) premiums paid to keep the life insurance portfolio in place ($79.6 million); (b) operating costs to support the assets until the assets could be sold ($20.3 million); (c) professional fees paid to the Receiver, Receiver's counsel and special counsel that pursued litigation ($21.0 million); and (d) monies spend to keep the PEMG headquarters in place through 2013 ($8.8 million) after which point the PEMG headquarters was shut down. The total of the Receiver's expenditures for administration was $129.7 million. See lower portion of Exhibit "B."

C. <u>Beneficial Decisions:</u>

From late April 2009 through approximately December 2012, the Receiver made several key decisions, with the input and support of a significant majority of the Investor Claimants, and in many cases the Court's approval. These decisions include: (a) an early decision to support the life insurance portfolio by spending over $1 million per week in insurance premiums (a difficult decision for a receiver less than one month into the administration of the cases); (b) this prompted a decision to begin to sell assets to support the life premium requirement and the

---

[1] The Receiver has previously reported an outstanding investment of $823.4 million. This number did not consider the repayment of $25.5 million that was returned to the investors at the time of the initial investment. The Investors recently agreed that this should be reflected as money received.

[2] The total recovery does not include any litigation settlements paid to the Investors outside the Receivership Estate. The total proceeds also do not include the potential future recoveries from the life insurance portfolio that are projected to be well in excess of another $100 million over time.

retention of Tranzon Asset Strategies as master auctioneer; (c) after researching several options, the Receiver recommended and the Investors and the Court agreed to invest up to $2 million of Receivership assets to analyze properly the portfolio that resulted in the retention of Lewis & Ellis – a firm specializing in actuary life portfolio evaluation; and (d) the decision to hold the portfolio necessitated the retention of ASG to administer the portfolio.  The combination of these decisions allowed the Receivership Estate to proceed effectively.

Additionally, the Receiver believes that the following decisions (not directly related to the life insurance portfolio) also contributed significantly to the Receivership's favorable recoveries:  (a) the investors decided on their own to proceed with "stand-alone" status rather than consolidation[3] – a consensus that took almost two years but ultimately saved the estate and the investors significant legal fees if, in the alternative, the matter would have been litigated; (b) decisions, which were also agreed to by the investors and approved by the Court, leading to the resolution of the "imponderable" questions – a method of dealing with transactions executed by PEMG's management prior to the Receivership, frequently unknown to the investors and often with draconian effects on one investor's position vs. another; and (c) decisions to, among other things, obtain confirmation of a constructive trust of PEMGroup assets, which resolved various tax issues and streamlined the filing of tax returns from several hundred down to two annual returns – resulting in another significant savings in administration costs.

D.   Unusual Attributes of the Case.

The fact that there were only eight investors (plus the group of 42 individuals in Taipei with a 1.8% share of the investment) helped streamline the administration of the case.  Each institutional investor proved to be sophisticated; this group was

---

[3]   "Stand alone" status meant that each investor would recover only from the assets in which that investor made an investment. Consolidation meant putting the assets in a pool where each investor would have a share of the pool.

represented by some of the most well-known law firms in the US.  Certain former PEMG employees agreed to cooperate at the outset of the matter – this greatly accelerated the recovery of assets and dissecting of prior financial conduct at a fraction of the cost that a forensic rebuilding of records effort could have cost (Grant Thornton affirmed the accuracy of testimony from former employees for under $100,000).  The Receiver's counsel also exercised restraint in filing litigation based on investigation and reasonably confirmed information while avoiding speculative litigation that could  easily consume a significant portion of an asset-rich case.  Some litigation was further handled on a contingent fee basis.

### E. Sale of Key Assets:

There were roughly 55 assets on three continents and in six countries to be liquidated.  The greatest cash contributions were made by the sale of (a) the office building located at 351 California Street in San Francisco (net recovery of $30.2 million); (b) the HD Supply stock investment (net recovery of $13.5 million); (c) the Emrise loans (net recovery of $14.8 million); and (d) ZIC investment in China (net recovery of $13.5 million).  Other favorable recoveries were (i) TapouT (net recovery of $8.8 million); (ii) Joe's Crab Shack (net recovery of $7.5 million); (iii) Irvine Insurance – a recovery from the British Virgin Islands (net recovery of $7.2 million); and Baker Shoes loan (net recovery of $5.0 million).  In total, these favorable recoveries produced a net recovery of $100.5 million versus an original investment of $128.3 or a 78% recovery.

### F. Unfavorable Recoveries:

Unfortunately, not all PEMG assets were able to be liquidated under such favorable terms as presented above.  As PEMG ran out of cash beginning in 2005 and 2006, PEMG's management appears to have invested in less prudent projects and assets, and without proper due diligence.  This likely contributed to some staggering losses on property sold, including:  (a) the China coal mines ($41 million invested and only $800,000 recovered); (b) ESuites ($19.1 million invested and

only $2.6 recovered); (c) Dominical, consisting of 970 acres of coastal property in Costa Rica ($13.6 million invested and only $400,000 recovered); (d) Willow Creek – a defunct golf course in Pahrump, Nevada ($6.5 million invested and only $500,000 recovered); and (e) an investment in real estate referred to as GH Redlands ($4.2 million invested and only $1.4 million recovered). With regard to this latter set of assets, a total of $84.4 million of investor money was "invested," and only $5.7 million was recovered or about 6.8% of the original investment.

G.  Litigation:

The Receiver's sixteen recovery litigation matters resulted in a net recovery of $18.4 million.

H.  Remaining Assets:

There are two assets and three litigation settlements that are not yet fully administered and/or collected – these are the subject of the assignment process discuss below. The Receiver estimates that these could have a collection value over time ranging from hundreds of thousands of dollars to millions. Given that the three litigation settlements remain pending, the FAR will not go into specifics due to the remaining administration that will be required to collect some of these assets. Exhibit "A" presents of list of the asset/settlements to be assigned.

I.  Tax Matters:

As indicated below in remaining tasks, the 2016 tax returns have to be prepared and filed reflecting minimal activity. An issue with the California Franchise Tax Board has been satisfactorily resolved by a writing from the California Franchise Tax Board.

J.  Special Recognition:

The Receiver notes that the progress and operations of the Receivership Estate were significantly benefited by assistance from certain individuals among the group of over 40 individuals in Taipei and the US that were involved in PEMG oversight or involvement on behalf of the investors. Jim Liu and Amy Liao, both

from Hua Nan Commercial Bank ("Hua Nan") are clearly at the top of the list for careful coordination, timely input and cooperation to achieve consensus in Taipei. David Liu (who is an actuary) from Bank SinoPac gets a large part of the credit for designing the analysis that resulted in the decisions to retain the potentially lucrative life portfolio and convincing the other investors to go forward with the investment. Kui Nakamura (formerly with Cosmos Bank) was valuable to the Receiver in terms of helping quantify some of the more obtuse assets. These contributions helped facilitate a favorable result.

## III. ACCOUNTING DATA AND PROFESSIONAL FEES

### A. Updating Cash Receipts:

The top line of Exhibit "C" presents the total receipts to date as reported in the Nineteenth Status Report (through June 30, 2015) of $226.7 million (column 1) followed by additional cash receipts of $1.9 million from July 1, 2015 through September 30, 2016 (column 2) and total receipts program to date of $228.7 million (column 3). The additional receipts from this later accounting period are from the ZIC settlement in Beijing and the final payment for Algonquin.

### B. Updating Cash Disbursements:

The lower majority of Exhibit "C" presents the expenses in the same time sequence as the receipts by column. Total cash disbursements through June 30, 2015 were a total of $129.1 million. An additional $558 thousand was disbursed between July 1, 2015 and September 30, 2016. Cash distributions to Investors totaled $112.7 million through June 30, 2015 plus another $5.5 million in the No. 2 column for a total distribution to investors of $118.2. Factoring in a starting cash balance of $20 million, this leaves a cash balance of $836 thousand as of September 30, 2016.

### C. Professional Fees:

Column 1 of Exhibit "D" is a summary of professional fees approved and paid from the inception of the case through May 31, 2016 that total $21.0 million.

Fees from June 1, 2016 through September 30, 2016 are $289,000 (Column 2 of "Exhibit C"). These will be the subject of a separately filed fee application. During this time frame, the Receiver (i) hosted a delegation of investors from Taipei for a wrap-up planning meeting, (ii) pursued open defaults on settlements, prepared and submitted various motions to the Court, (iii) addressed and resolved new claims/issues raised by the California Franchise Tax Board, and (iv) updating the status of the remaining assets to prepare them for transfer. Fees to close the case (October 1, 2016 through approximately December 31, 2016), barring any unforeseen circumstances, are projected at $165,000 (Column 3 of Exhibit "C"). The tasks to be covered by these fees are outlined in Paragraph 17 below. The total unapproved fees are $454,000. The total projected fees including both approved and unapproved fees stand at $21.4 million.

D. Fees as a Percent of Revenues:

Total professional fees as a percent of gross recoveries (cash that came into the case including the assigned value of the transferred life portfolio) stands at 5.6%. This is a very favorable percentage, especially considering the corresponding statutory limitation of approximately 3% for a trustee (not including staff or professionals) in a bankruptcy matter. *See* 11 U.S.C. 326(a). By contrast, just the Receiver's fee in this case is 0.7% or less than 1.0%.

IV. **REMAINING TASKS TO BE COMPLETED**

A. Summary of Remaining Tasks:

The following is a list of remaining tasks. This list is unusually long and even complex due to the fact that the case is being closed before all of the assets have been administered, as explained above. It is the composition of this list that makes the remaining fees high. The list of tasks includes:

- Preparing a notice of the FAR to approximately 1,000 entities and individuals worldwide that did business with the PEMG Receivership estate.
- Preparing, finalizing the FAR and attending the hearing on the FAR.

1.  • Respond to any objections to the FAR.
2.  • Turning over selective books and records to the Taiwanese investors.
3.  • Storing and eventually destroying the Receiver's books and records.
4.  • Turnover of the PEMG computer(s) and software licenses to the investors.
5.  • Prepare and file a final SEC accounting.
6.  • Prepare final distributions to the institutional investors.
7.  • Prepare the final distributions to the 42 individual investors in Taipei.
8.  • Continue to pursue and collection litigation settlements.
9.  • Transfer and assign remaining assets/ litigation settlements to the Investors. (NOTE: Assuming the Court has no objection, certain Investor Claimants may retain Mosier & Company, Inc. and/or Dentons US LLP (or other professionals Mosier & Company, Inc. may choose to retain) directly to oversee certain assets and/or litigation settlements post-Receivership).
10. • Provide accountants with final numbers for the final tax returns.
11. • Accrue amounts for the future payment of stored books and records.
12. • Terminate and close employee benefits plan.
13. • Close and/or dissolve PEMGroup entities.
14. • Pay final fees and expenses.

B. <u>Discussion</u>:

It is a combination of closing the case early and the long and involved list of remaining projects that causes the closing fees and cost estimates to be high. Some expenses such as storage will extend over the next seven years before conclusion. The assignment of assets and turnover of PEMG books and records (not the Receiver's records) plus the PEMG computer adds to this activity.

V. **FORECAST FOR THE FINAL DISTRIBUTION**

A. Forecast of Final Distribution:

To date, investors have received $118.2 million plus the assigned value of the life policies at $129.3 million for a total distribution $247.5 million. The amount of cash that remains in the estate available for distribution to the Investors is currently projected to be $406 thousand (Exhibit "E"). With Court approval of the FAR and the final fees, this is the amount projected to be distributed to the investors in proportion to the formulas approved by the investors and the Court. As a percent of the net investment discuss above, the recovery is 31.1% excluding the future value of the life insurance policies and the settlement of the investor-filed lawsuit.

B. Assignment of Assets and Claims:

The Receiver seeks authority to assign the two assets and three settlements as instructed by the institutional investors including a reserve of 1.89% for the 42 individual investors. The Receiver seeks authority to make the final distributions as outlined to allow the case to be closed.

C. Summary/Conclusion:

After seven plus years, the PEMG case is ready to close with a solid recovery for the victims and comparatively modest professional fees.

Date: October 24, 2016

_____
Robert P. Mosier
Receiver

## INDEX OF EXHIBITS

**Exhibit A:** Summary of Assets/Settlements to be Assigned

**Exhibit B:** Summary of Recoveries

**Exhibit C:** Schedule of Cash Flow from May 1, 2009 through September 30, 2016

**Exhibit D:** Schedule of Professional Fees from May 1, 2009 through End of Case

**Exhibit E:** Projected Final Distribution to the Investors